FILED
15-0975
12/21/2015 7:10:33 PM
tex-8333751
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

Case No. _____

## IN THE SUPREME COURT OF TEXAS

**LINDA BATISTE,**
*Petitioner.*

**V.**

**JOHNSON & JOHNSON and ETHICON, INC.,**
*Respondents.*

**From the Fifth District Court of Appeals, Cause No. 05-14-00864-CV, and the 95TH Judicial District Court, Dallas County, Cause No. DC-12-14350, Honorable Ken Molberg, Presiding**

## PETITION FOR REVIEW

FREESE & GOSS, PLLC
Tim K. Goss
Texas Bar No. 08222660
tim@freeseandgoss.com
3031 Allen St., Ste. 200
Dallas, TX 75204
P: 214.761.6610
F: 214.761.6688

EDWARDS & DE LA CERDA, PLLC
Peter de la Cerda
Texas Bar No. 24045769
peter@edwardsdelacerda.com
3031 Allen St., Ste. 100
Dallas, TX 75204
P: 214.550.5239
F: 214.722.2101

CAPSHAW & ASSOCIATES
Richard A. Capshaw
State Bar No. 03783800
richard@capslaw.com
3031 Allen St., Ste. 201
Dallas, TX 75204
P: 214.761.6610
F: 214.761.6611

MATTHEWS AND ASSOCIATES
David P. Matthews
Texas Bar No. 13206200
dmatthews@thematthewslawfirm.com
2509 Sackett St.
Houston, TX 77098
P: 713.522.5250
F: 713.535.7184

*Counsel for Petitioner*

# IDENTITY OF PARTIES AND COUNSEL

The following constitutes a list of all parties to the trial court's final judgment and the names and addresses of all trial and appellate counsel:

Petitioner:                                   Linda Batiste

Petitioner's Trial Counsel:                   Richard A. Capshaw
                                              Capshaw & Associates
                                              3031 Allen St., Ste. 201
                                              Dallas, TX 75204
                                              Telephone: (214) 761-6619
                                              Fax: (214) 761-6611
                                              richard@capslaw.com

                                              Richard A. Freese
                                              Tim K. Goss
                                              Freese & Goss, PLLC
                                              3031 Allen St., Ste. 200
                                              Dallas, TX 75204
                                              Telephone: (214) 761-6610
                                              Fax: (214) 761-6688
                                              tim@freeseandgoss.com
                                              rich@freeseandgoss.com

                                              Peter de la Cerda
                                              Edwards & De La Cerda, PLLC
                                              3031 Allen St., Ste. 100
                                              Dallas, TX 75204
                                              Telephone: (214) 550-5239
                                              Fax: (214) 550-5223
                                              peter@edwardsdelacerda.com

                                              Thomas P. Cartmell
                                              Wagstaff & Cartmell, LLP
                                              4740 Grand Avenue, Ste. 300
                                              Kansas City, MO 64112

i

Telephone: (816) 701-1100
Fax: (816) 531-2372
tcartmell@wcllp.com

David P. Matthews
Matthews & Associates
2509 Sackett St.
Houston, TX 77098
Telephone: 713 522-5250
Fax: (713) 535-7184
dmatthews@thematthewslawfirm.com

Petitioner's Appellate Counsel:      Richard A.   Capshaw
Capshaw & Associates
3031 Allen St., Ste. 201
Dallas, TX 75204
Telephone: (214) 761-6619
Fax: (214) 761-6611
richard@capslaw.com

Tim K. Goss
Sara Turman-Vedral
Freese & Goss, PLLC
3031 Allen St., Ste. 200
Dallas, TX 75204
Telephone: (214) 761-6610
Fax: (214) 761-6688
tim@freeseandgoss.com
skturman@hotmail.com

Peter de la Cerda
Edwards & De La Cerda, PLLC
3031 Allen St., Ste. 100
Dallas, TX 75204
Telephone: (214) 550-5239
Fax: (214) 550-5223
peter@edwardsdelacerda.com

ii

David P. Matthews
Matthews & Associates
2509 Sackett St.
Houston, TX 77098
Telephone: 713 522-5250
Fax: (713) 535-7184
dmatthews@thematthewslawfirm.com

Respondents:       Johnson & Johnson
Ethicon, Inc.

Respondent's Trial Counsel:   David R. Noteware
Janelle L. Davis
Thompson & Knight, LLP
1722 Routh Street, Ste. 1500
Dallas, TX 75201
Telephone: (214) 969-1432
Fax: (214) 999-1543
david.noteware@tklaw.com
janelle.davis@tklaw.com

William M. Gage
Butler Snow LLP
1020 Highland Colony Parkway, Suite 1400
Ridgeland, MS 39157
Telephone: (601) 985-4561
Fax: (601) 985-4500
william.gage@butlersnow.com

Helen Kathryn Downs
Butler Snow LLP
One Federal Place, Ste. 1000
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: (205) 297-2200
Fax: (205) 297-2201
helenkathryn.downs@butlersnow.com

Richard Bernardo
Skadden, Arps, Slate, Meagher &
Flom, LLP
Four Times Square
New York, NY10036
Telephone: (212) 735-3453
Fax: (917) 777-3453
richard.bernardo@skadden.com

Kay Deming
Troutman Sanders, LLP
Bank of America Plaza
Suite 5200
600 Peachtree Street, N.E.
Atlanta, GA 30308-2216
Telephone: (404) 885-3124
Fax: (404) 962-6543
karen.deming@troutmansandert.com

Philip J. Combs
Thomas, Combs & Spann
300 Summers Street
Suite 1380
Charleston, WV 25301
Telephone: (304) 414-1800
PCombs@tcspllc.com

Respondent's Appellate Counsel:     Charles C. Lifland
O'Melveny & Myers LLP
400 South Hope Street,
18th Floor
Los Angeles, CA 90071
Telephone (213) 430-6665
Fax: (213) 430-6407
clifland@omm.com

Stephen D. Brody
O'Melveny & Myers LLP

iv

1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5167
Fax: (202) 383-5414
sbrody@omm.com

David R. Noteware
Thompson & Knight, LLP
1722 Routh Street
Dallas, TX 75201
Telephone: (214) 969-1432
Fax: (214) 999-1543
david.noteware@tklaw.com

Scott P. Stolley
Cherry Petersen Landry Albert, LLC
Campbell Centre 8350 N. Central
Expressway Suite 1500
Dallas, TX  75206
Telephone: (214) 265-9268
Fax: (214) 265-7008
sstolley@cplalaw.com

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................ix

STATEMENT OF THE CASE.................................................................................x

STATEMENT OF JURISDICTION......................................................................xi

ISSUES PRESENTED...................................................................................... xii

ISSUE NO. 1: Did the Dallas Court of Appeals err by interpreting Texas common law to require that a product liability plaintiff must isolate the cause of her injuries to a "specific defect" *in a medical device case* when medical device cases were specifically exempted from such a requirement under the codification of Texas product liability law at Texas Civil Practice and Remedies Code § 82.005(a), no such requirement is expressly stated in Restatement (Second) Torts § 402A, and where such evidence was not required by this Court in the analogous context of a cigarette case. *See American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997)?

ISSUE NO. 2: If a Plaintiff is required to offer proof isolating a specific defect in the medical device as the cause of her injuries, what evidence is sufficient to satisfy such a standard in the case of an implanted medical device?

ISSUE NO. 3: Where Plaintiff presented evidence that: (1) particular defects in an implanted pelvic mesh medical device can cause certain complications, (2) the Plaintiff suffered from the very same complications after being implanted with the mesh device, and (3) qualified experts opined that the alleged defects were exhibited in the TVT-O device explanted from the Plaintiff, and (4) the Plaintiff exhibited symptoms and injuries consistent with the alleged defects upon physical examination and review of her medical records: Did the Court of Appeals err by discounting Plaintiff's evidence, and crediting competing evidence presented by Defendants, so as to reverse the judgment in Plaintiff's favor?

ISSUE NO. 4: Was the evidence presented at trial legally sufficient to

support the jury's verdict for Plaintiff on Plaintiff's design-defect claim?

STATEMENT OF FACTS ............................................................................ 1, fn.1

SUMMARY OF THE ARGUMENT ......................................................................1

ARGUMENT & AUTHORITIES .........................................................................3

I.  THE BETTER VIEW OF CONFLICTING TEXAS LAW IS THAT
    THE "SPECIFIC DEFECT" CAUSATION REQUIREMENT DOES
    NOT APPLY TO MEDICAL DEVICE AND DRUG CASES. .....................3

    A.  Courts Applying Texas Common Law Have Reached Inconsistent
        Results on Whether a Causal Connection to a "Specific Defect" is
        Necessary in a Medical Device Case. ....................................................3

    B.  The Jury Charge ...................................................................................7

II.  THE COURT OF APPEALS ERRED BY HOLDING THAT
     PLAINTIFF HAD NOT PRESENTED SUFFICIENT EVIDENCE TO
     MEET A HEIGHTENED SPECIFICITY STANDARD. ...............................7

    A.  When Properly Viewed in the Light Most Favorable to Plaintiff,
        the Trial Evidence Established That The TVT-O's Mechanically-
        Cut Mesh Edges Caused Plaintiff's Erosion and Urethral Pain...........8

    B.  When Properly Viewed in the Light Most Favorable to Plaintiff,
        the Trial Evidence Established That the TVT-O's Propensity for
        Degradation And Particle Loss Caused Plaintiff's Pain. ....................12

    C.  When Properly Viewed in the Light Most Favorable to Plaintiff,
        the Trial Evidence Established That the TVT-O's Use Of
         Heavyweight, Small-Pore Mesh Caused Plaintiff's Pain...................14

CONCLUSION AND PRAYER .........................................................................15

CERTIFICATE OF COMPLIANCE .................................................................18

CERTIFICATE OF SERVICE ...............................................................................19

# INDEX OF AUTHORITIES

## Cases

*American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420 (Tex. 1997)...... xi, 1, 5, 6

*Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374 (Tex.1978) ...........................4

*Darryl v. Ford Motor Co.*, 440 S.W.2d 630, 632 (Tex.1969) .................................10

*Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 237 (5th Cir. 2003) ..........................10

*Golod v. La Roche*, 964 F. Supp. 841 (S.D.N.Y. 1997) ............................................6

*Kennedy v. Collagen Corp.*, 161 F.3d 1226 (9th Cir. 1998)......................................6

*Lewis v. Johnson & Johnson,* 601 F.App'x 205 (4th Cir. 2015) ...............................4

*Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572 (Tex. 2006) ......................................6

*Nissan v. Motor Co., Ltd. v. Armstrong*, 145 S.W.3d 131 (Tex. 2004) ...................5

*Perkins v. Origin Medsystems Inc.*, 299 F. Supp. 2d 45 (D. Conn. 2004) ...............6

## Statutes

TEX. CIV. PRAC. & REM. CODE § 82.005....................................................... xii, 1, 3-6

TEX GV. CODE ANN. § 22.001 ..........................................................................xi

## Other Authorities

RESTATEMENT (SECOND) OF TORTS § 402A (1965) ........................................ xii, 1, 5

## STATEMENT OF THE CASE

Nature of the case:      This is a product liability case involving the TVT-Obturator medical device manufactured and sold by Respondents to treat stress urinary incontinence.

Trial Court:      The Honorable Ken Molberg, 95TH Judicial District Court, Dallas County, entered a final judgment for Plaintiff in Cause No. DC-12-14350.

Court of Appeals:      Fifth District Court of Appeals, Dallas.

Parties in the Court of Appeals:      Appellants: Johnson & Johnson, Ethicon, Inc.
Appellee: Linda Batiste

Disposition:      Justice Robert Fillmore authored the court's opinion, reversing the judgment of the trial court and rendering judgment in favor of appellants/defendants Johnson & Johnson and Ethicon, Inc. No motions for rehearing were filed.

Status of opinion:      The court's opinion is not published in the Southwest Reporter. The opinion is available online at *Johnson and Johnson v. Batiste,* 05-14-00864, 2015 WL 6751063 (Tex.App. Dallas, Nov. 5, 2015).

## STATEMENT OF JURISDICTION

This Court has jurisdiction pursuant to: (1) section 22.001(a)(2) because the case presents an opinion by a court of appeals that differs from prior decisions of other courts of appeals and of the supreme court on the question of what proof is necessary to establish causation in a product liability case involving a medical device and (2) section 22.001(a)(6) of the Texas Government Code because this case presents an important issue of product liability law which is likely to recur in future cases.

# ISSUES PRESENTED

ISSUE NO. 1: Did the Dallas Court of Appeals err by interpreting Texas common law to require that a product liability plaintiff must isolate the cause of her injuries to a "specific defect" *in a medical device case* when medical device cases were specifically exempted from such a requirement under the codification of Texas product liability law at Texas Civil Practice and Remedies Code § 82.005(a), no such requirement is expressly stated in Restatement (Second) Torts § 402A, and where such evidence was not required by this Court in the analogous context of a cigarette case. *See American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997)?

ISSUE NO. 2:   If a Plaintiff is required to offer proof isolating a specific defect in the medical device as the cause of her injuries, what evidence is sufficient to satisfy such a standard in the case of an implanted medical device?

ISSUE NO. 3:   Where Plaintiff presented evidence that: (1) particular defects in an implanted pelvic mesh medical device can cause certain complications, (2) the Plaintiff suffered from the very same complications after being implanted with the mesh device, and (3)  qualified experts opined that the alleged defects were exhibited in the TVT-O device explanted from the Plaintiff, and (4) the Plaintiff exhibited symptoms and injuries consistent with the alleged defects upon physical examination and review of her medical records: Did the Court of Appeals err by discounting Plaintiff's evidence, and crediting competing evidence presented by Defendants, so as to reverse the judgment in Plaintiff's favor?

ISSUE NO. 4:  Was the evidence presented at trial legally sufficient to support the jury's verdict for Plaintiff on Plaintiff's design-defect claim?

# SUMMARY OF THE ARGUMENT[1]

This petition presents a question that will impact thousands of cases brought under Texas law: namely, what evidence is necessary to satisfy the causation standard in a products liability case involving an implanted medical device.

In particular, the Court is asked to clarify whether (1) the Dallas Court of Appeals has accurately interpreted Texas common law to hold a product liability plaintiff must isolate the cause of her injuries to a "specific defect" *in a medical device case* or (2) whether this Court's holding and rationale in *American Tobacco Co., Inc. v. Grinnell*, 951 S.W.2d 420, 425 (Tex. 1997) together with codification of Texas law in Texas Civil Practice and Remedies Code § 82.005(a), and Texas' adoption of Restatement (Second) Torts § 402A, indicate a product liability claim *involving an ingestable or implantable product such as a drug or medical device* may be established through evidence the plaintiff's injuries were caused by a defective product as a whole. If the latter approach is correct, the Court of Appeal's opinion must be reversed because sufficient evidence showed Plaintiff's injuries were caused by the TVT-O.

---

[1] Statement of Facts: The court of appeals correctly stated the nature of this case, which is a products liability action involving the TVT-O implanted pelvic mesh device. However, the Court of Appeals erred by ignoring or undervaluing trial evidence supporting the jury's verdict and by crediting competing evidence contrary to the verdict and judgment for Plaintiff. Because the facts of this case are relevant primarily as they relate to the sufficiency of the evidence, for purposes of this Petition, Plaintiff will incorporate and discuss the relevant facts and evidence in Section II. of her Argument rather than in a separately designated Statement of Facts.

1

Alternatively, if the Court concludes a heightened degree of specificity is appropriate for causation evidence in a medical device case, the Court is asked to instruct litigants on the level of proof necessary to meet such a burden by considering the sufficiency of the evidence in this case. Here, the Court of Appeals acknowledged in its opinion that Plaintiff had established three defects were known to cause particular injuries, Ms. Batiste suffered from those same injuries, and qualified experts had opined that defects in the TVT-O were the cause of Plaintiff's injuries. Nevertheless, the Court of Appeals held the causal link between the specific defect and Plaintiff's injuries because it discounted Plaintiff's favorable evidence and fixated on the absence of direct evidence of what was going on inside the Plaintiff's body at the time of injury:

- "Although there was evidence curling, fraying, and roping of the polypropylene mesh in the TVT-O could cause an erosion, there was no evidence the mesh inside Batiste had curled, frayed or roped at the time it was removed." [Opinion, pp. 14-15];

- "Although there was evidence that particle loss from the mesh could cause pelvic pain, there was no evidence of any particle loss from the mesh while it was inside Batiste's body." [Opinion p. 18].

- "Although Margolis testified a heavyweight, small-pore mesh could contract more than a lightweight, large-pore mesh, there was no evidence regarding the extent, if any, to which the mesh contracted inside of Batiste's body." [Opinion p. 20].

If Texas common law requires a Plaintiff to isolate a specific defect as the

cause of her injuries in a drug and device case (which it does not), and if proving causation requires direct evidence of how specific defective elements of a drug or device are reacting within the complex and hidden systems of the human body (which it should not), then it will be virtually impossible for any Plaintiff to prevail on a product liability claim against a drug or device manufacturer in Texas. Because Petitioner does not believe that such a result is intended or required by Texas law, she respectfully requests that the Court grant her petition for review.

## ARGUMENT AND AUTHORITIES

I. **THE BETTER VIEW OF CONFLICTING TEXAS LAW IS THAT THE "SPECIFIC DEFECT" CAUSATION REQUIREMENT DOES NOT APPLY TO MEDICAL DEVICE AND DRUG CASES.**

The opinion of the Court of Appeals is fixated upon the need for evidence connecting Plaintiff's injuries, not merely to a defectively designed *product,* but, to a *specific defect* in the product. This heightened specificity of causation proof has been statutorily required for product liability cases <u>not</u> involving medical devices or drugs since 1993. *See* TEX. CIV. PRAC. & REM. CODE § 82.005(a)(2). However, cases involving drugs and devices, continue to be governed by Texas' common law liability standards which have been inconsistently interpreted and applied.

A. **Courts Applying Texas Common Law Have Reached Inconsistent Results on Whether a Causal Connection to a "Specific Defect" is Necessary in a Medical Device Case.**

3

Prior to the present case, the sole opinion known to Plaintiff to have applied a "specific defect" requirement in a medical device case decided under Texas law is *Lewis v. Johnson & Johnson,* 601 F.App'x 205 (4th Cir. 2015). Similar to the case at bar, *Lewis* involved claims that a defectively-designed TVT mesh device caused her to suffer pelvic pain and dyspareunia. *Id.* at 211. Relying upon two cases <u>*not involving medical devices*</u>, the Fourth Circuit interpreted Texas common law as requiring the Plaintiff to show "both the defective condition of a product and a causal connection between that defect and a plaintiff's injuries" *Id.* at fn. 2, citing , *Lucas v. Tex. Indus., Inc.,* 696 S.W.2d 372, 377 (Tex.1984)(claim involving lifting equipment on job site); *Armstrong Rubber Co. v. Urquidez,* 570 S.W.2d 374, 376 (Tex.1978) (tire blowout). Thus, the *Lewis* case and the case at bar, both erred by imposing a "specific defect" requirement that is inconsistent with other pronouncements of the causation evidence needed in medical device cases.

- <u>Statutory Law</u>: Texas Civil Practice and Remedies Code § 82.005(a), which is a codification of Texas' specific causation requirements for product liability cases, requires a plaintiff to show that "the defect" in an unreasonably dangerous product was a producing cause of her injury. TEX. CIV. PRAC. & REM. CODE § 82.005(a)(2)(enacted Sept. 1993). Yet, by its express terms, Section 82.005(a)(2) does not define the causation inquiry in a device case. Section 82.005

4

plainly states, **"[t]his section does not apply to: a drug or device**, as those terms are defined in the federal Food, Drug, and Cosmetic Act." *Id.*

- Restatement: Restatement (Second) Torts § 402A, which has been adopted in Texas, describes the product liability inquiry as follows:

> One who sells any ***product*** in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property.

Restatement (Second) Torts § 402A (emphasis added); S*ee, Am. Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 426 (Tex. 1997). The theory behind Section 402A is that if a company sells an unreasonably dangerous product, and that *product* injures a user, then liability should be imposed on the manufacturer. Rest. § 402A., cmt. c. Following that logic, Plaintiff's burden was to show the TVT-O device was defective, and that the defective device caused her injury.[2]

Case law: Admittedly, it is possible to find language in cases referring to a link between the "defect" and the injury. However, this language generally arises cases involving a product other than a drug or medical device. *E.g., Nissan v. Motor Co., Ltd. v. Armstrong,* 145 S.W.3d 131 (Tex. 2004); *Mack Trucks, Inc. v.*

---

2 Ethicon argued to the appellate court that the "thereby caused" language in section 402A should be viewed as referring back to the phrase "defective condition" -- and thereby imposing a specific defect causation showing. The better construction, however, is that "thereby caused" refers back to the manufacturer's act of "selling a product in a defective condition."

*Tamez,* 206 S.W.3d 572, 575-76 (Tex. 2006). Thus, the rationales underlying these cases do not apply as neatly to the complex and hidden workings of the human body. Indeed, imperfect knowledge of the human body is part of the reason courts across the country have held a plaintiff does not have to establish the precise mechanism of action by which a drug or device causes injury as a prerequisite for recovery. *See Perkins v. Origin Medsystems Inc.*, 299 F. Supp. 2d 45, 60 (D. Conn. 2004), *quoting, Golod v. La Roche*, 964 F. Supp. 841, 858 (S.D.N.Y. 1997); *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1330 (9th Cir. 1998).

Although the precise issue has not been presented in a medical device case, this Court has decided an analogous cigarette case where the distinction between "product" and "specific defect in the product" was potentially dispositive. In *American Tobacco Co., Inc. v. Grinnell*,[3] the decedent died of lung cancer after smoking the defendant's cigarettes. 951 S.W.2d 420, 425 (Tex. 1997). The plaintiffs claimed that the cigarettes (the product) were defective because of pesticide residue (the defect) used in the manufacturing process. *Id.* at 433-34. Importantly, none of the plaintiff's experts testified the pesticide residue specifically had caused the decedent's lung cancer. *Id.* at 434. In affirming the denial of summary judgment, the Supreme Court did not require a link between the

---

3 *Grinnell* was a common-law case, even though it was decided after the implementation of Tex. Civ. Prac. & Rem. Code § 82.005. The cause of action arose before the statute became law. *See Id.* at 433, n.9.

alleged defect (pesticide residue) and the plaintiff's injury (cancer). Rather, the court simply required a showing the product (the cigarette) was defective, and expert testimony the product had injured the decedent. *See id.* at 434-35. The Court's approach in *Grinnell* – which involved an ingestable substance and therefore presented issues akin to those in cases involving drugs or implanted devices – counsels a different standard for causation proof in medical device cases than the one applied by the Court of Appeals in this case.

## B. The Jury Charge

Clarification of the evidentiary burden in a drug or device case additionally implicates the interpretation of PJC 71.4B for such a case. Here, the jury was charged in accordance with PJC 71.4B to determine: "Was there a design defect in the TVT-O at the time it left the possession of Ethicon/Johnson & Johnson that was a producing cause of injury to Linda Batiste?" [4 CR 5327]. If the Court agrees with Plaintiff that it is not necessary to isolate a single, specific defect in the TVT-O device as the cause of her injury, PJC 71.4B may be interpreted as requiring a finding that condition(s) of the TVT-O device rendered it unreasonably dangerous (i.e. "design defects") and the unreasonably dangerous *product* was the producing cause of the plaintiff's injuries.

## II. THE COURT OF APPEALS ERRED BY HOLDING THAT PLAINTIFF HAD NOT PRESENTED SUFFICIENT EVIDENCE TO

**MEET A HEIGHTENED SPECIFICITY STANDARD.**

If Texas law requires plaintiffs to isolate a specific defect in a medical device as the cause of their injuries (which it does not), guidance is needed from this Court in determining what evidence is sufficient to meet the heightened specificity standard. Here, The Court of Appeals found Plaintiff had shown each of the three defects in the TVT-O were capable of causing an injury suffered by Plaintiff: (1) fraying, roping and curling of the TVT-O's mechanically cut mesh can cause erosions [Opinion, p. 14]; (2) degradation and particle loss can cause pain [Opinion, p. 18]; and (3) heavyweight, small pore mesh can cause scarring, contraction and pain [Opinion, pp. 19-20]. Yet, in reversing the judgment for Plaintiff, the Court either discounted evidence favorable to Plaintiff in favor of Defendants' contrary evidence or cited the absence of evidence that would be virtually impossible for a plaintiff to obtain. When the evidence is properly viewed in the light most favorable to the jury's verdict, as the standard of review requires, this Court should find Plaintiff provided sufficient evidence of causation.

**A.    When Properly Viewed in the Light Most Favorable to Plaintiff, the Trial Evidence Established That The TVT-O's Mechanically-Cut Mesh Edges Caused Plaintiff's Erosion and Urethral Pain.**

On the simplest level, the Court of Appeals erred by finding Plaintiff's causation evidence insufficient where it is undisputed the Plaintiff suffered an

injury that can *only* occur in connection with a mesh implant. Plaintiff's treating physician, Dr. Brown, offered undisputed testimony that Plaintiff had suffered an erosion of the mesh through her vaginal wall. [14 RR 80:17-81:13]. In addition, the appellate court acknowledged, "there was evidence curling, fraying and roping of the polypropylene mesh in the TVT-O could cause an erosion." [Opinion pp. 14-15; e.g. 12 RR 133:17-134:2]. Nevertheless, the appeals court concluded Plaintiff's causation evidence was insufficient because "there was no evidence the mesh inside Batiste had curled, frayed, or roped." [Opinion, pp. 14-15].

To reach its conclusion, the Court of Appeals necessarily discounted or disregarded the following evidence that the TVT-O mesh had curled and frayed while inside Plaintiff's body:

(1) Evidence from Ethicon's own studies showing mechanically cut mesh roped and frayed when stretched. [9 RR 64:5-66:20; PX 1406].

(2) Dr. Margolis' expert testimony that he commonly observed fraying and roping in mesh explanted from other women. [9 RR 58:16-23].

(3) Photographs of the TVT-O explanted from Plaintiff's body which showed the mesh had curled, frayed and roped. [EX. 4064a; 9 RR 141:9-142:4]).

(4) Expert testimony from Dr. Margolis' that the photographs of Plaintiff's TVT-O explant reflected curling, roping and fraying. [9 RR 67:12-15; 9 RR 141:5-142:4].

Importantly, Plaintiff's gynecologist, Dr. Brown, did not testify either way

9

regarding curling, fraying and roping of the mesh during her surgical treatment of the erosion. And while the explanting doctor, Dr. Lemack, testified that he had never seen fraying with any mesh, he did not address the roping and curling defects. Thus, the only evidence of roping and curling presented in the case supports the jury's verdict for Plaintiff with regard to the cause of the erosion.[4]

The Court of Appeals erred by refusing to credit Plaintiff's evidence of the mesh roping and fraying inside Plaintiff's body. Texas courts recognize circumstantial evidence and reasonable inferences therefrom may form a sufficient basis for finding causation in a product liability case. *See Darryl v. Ford Motor Co.,* 440 S.W.2d 630, 632 (Tex.1969); *Flock v. Scripto-Tokai Corp.,* 319 F.3d 231, 237 (5th Cir. 2003). When properly considered in the light most favorable to the jury's verdict, more than sufficient evidence existed to allow the jury to reasonably conclude mechanically cut mesh (which (1) was known to rope and curl during testing, (2) which had been shown to have roped and curled in other patients, and (3) which was shown to be roped and curled in pictures of the Plaintiff's explant) had roped and curled so as to cause an erosion.[5]

---

4 The Court of Appeals questioned whether the roping and curling seen in the photographs of Plaintiff's explant existed at the time of the erosion (in June of 2012) because the product was not removed and photographed until sometime after September of 2013 and because it had been placed in the preservative formalin before it was sent for examination. [Opinion, p. 14]. At most, this evidence raises a fact issue that the jury could, and did, decide in Plaintiff's favor.
5 The Court of Appeals noted that there were potential causes for Plaintiff's erosion and urethral

In addition to causing the erosion, Plaintiff presented sufficient evidence the curling and roping of the mechanically-cut edges of the TVT-O mesh caused her urethral pain. Plaintiff's evidence linking the mechanically-cut mesh to urethral pain included the following:

- Ethicon acknowledged on multiple occasions that the mechanically cut edges of the TVT-O "would curl and rope which reduces the surface area of the mesh under the urethra and therefore increases the pressure in a localized point." [8 RR 209:10-24; 12 RR 124:19-25].

- Ms. Batiste had urethral pain which began shortly after the TVT-O was implanted and which she could clearly differentiate from her other ailments. [9 RR 125:1-9; 11 RR 71:10-14].

- Ms. Batiste's explanted mesh was twisted, roped, folded and had frayed edges. [9 RR 141:9-142:4]

- Upon physical examination, Dr. Margolis determined Ms. Batiste's urethra was scarred and tender. [9 RR 126:17].[6]

_____

pain other than the fraying, roping and curling of the TVT-O's mechanically-cut mesh. When properly viewed in the light most favorable to Plaintiff, the potential alternative causes cited by the Court of Appeals are not supported by the record. First, there is no evidence of poor vaginal healing in Plaintiff's medical records. Plaintiff's post-surgical records for both the implant and explant of the TVT-O consistently noted that she was "healing well." [14 RR 70:19-21; 73:4-73:11; 14 RR122:3-123:3]. Second, there was no evidence of a failure of the vagina to close over the mesh. Dr. Brown confirmed that, at the time the erosion was discovered, Plaintiff was beyond the healing period for the implantation of a TVTO. [14 RR 70:1-6]. Third, surgical error is not supported by the record because Plaintiff's treating gynecologist, Dr. Brown, testified that the TVT-O appeared to have been implanted properly [14 RR 85:23-86:4]. Lastly, Plaintiff's treating gynecologist testified that she considered infection and vaginal atrophy as part of her differential diagnosis, but after considering the exam findings and test results, concluded that the TVT-O erosion was the cause of Plaintiff's pelvic pain. [15 RR 76:13-18; 77:15-20; 83:11-18]

[6] Dr. Lemack's testimony that he did not find unusual scarring or evidence of any erosion or extrusion into the urethra at the time he explanted the TVT-O, [14 RR 160:6-9], does not refute Plaintiff's evidence regarding the effect of roped and folded mesh in increasing pressure on the urethra or the evidence of urethral pain and tenderness. At most, Dr. Lemack's testimony raises a fact issue regarding the extent of Plaintiff's urethral scarring.

For the same reasons discussed above, this evidence is legally sufficient to support the jury's conclusion that Ms. Batiste's urethral pain and other injuries were attributable to a defect in the TVT-O. [9 RR 127:23-128:11].

B. **When Properly Viewed in the Light Most Favorable to Plaintiff, the Trial Evidence Established That the TVT-O's Propensity for Degradation And Particle Loss Caused Plaintiff Pain.**

At trial, Plaintiff presented evidence her pelvic pain was caused by the degradation and particle loss occurring with the defectively designed TVT-O. Importantly, the Appellate Court acknowledge, "[t]here was evidence that particle loss from the mesh could cause pelvic pain." [Opinion, p. 18]. Yet, the Court concluded the judgment in Plaintiff's favor should be reversed because there was no evidence of particle loss inside Plaintiff's body. [Opinion, p. 16].

The Appellate Court's insistence on direct evidence of particle loss inside Plaintiff's body imposes an impossible causation standard. Plaintiff offered the following evidence that particle loss caused her injuries: (1) evidence that Ethicon's own researchers determined that mechanically cut mesh, when stretched, loses its integrity, degrades, and suffers particle loss, [9 RR 66:21-68:2]; (2) expert testimony Plaintiff's TVT-O explant exhibited degradation via testing conducted by Dr. Jordi, [8 RR 57:11-60:10; Opinion, p. 16], (3) expert testimony from both

Dr. Jordi and Dr. Margolis large cracks in Plaintiff's TVT-O explant were regions where polypropylene particles had flaked off, [8 RR 57:11-60:10; Opinion, p. 17],[7] (4) evidence other physicians had observed particle loss in their practices and concluded that particle loss could cause pelvic pain, [Opinion, p. 16], (5) evidence Ethicon's Medical Director, Dr. Piet Hinoul, admitted that the shedding of polypropylene particles into the vaginal tissue causes inflammation and pain,[12 RR 126:4-11], and (6) evidence Plaintiff's vaginal pain and pelvic pain, beginning after the TVT-O was implanted, were consistent with Dr. Hinoul's account of the body's response to foreign particles [9 RR 125:1-9].

Short of a surgical expedition to gather proof, there is no means for Plaintiff to definitively establish particle loss inside Plaintiff's body. Yet, substantial indirect evidence existed showing the product was broadly known to exhibit particle loss, physicians had witnessed particle loss with the product, the explanted mesh reflected particle loss, and the Plaintiff's injuries were consistent with the injuries acknowledged to have been caused by particle loss. Thus, the facts of this case support Dr. Margolis' opinion that Plaintiff's pelvic pain was attributable to the TVT-O, and particularly, to the erosion, contracture, and particle loss caused

---

7 The Court of Appeals discounted Plaintiff's evidence of particle loss based on the condition of Plaintiff's explanted mesh because the explanted material had been placed in the preservative formalin and had been handled by the experts in connection with the testing process. [Opinion, p. 17]. This evidence merely raises a fact issue that the jury could, and did, reasonably decide in Plaintiff's favor.

by defects in the sling. [9 RR 127:23-128:11].

### C. When Properly Viewed in the Light Most Favorable to Plaintiff, the Trial Evidence Established That TVT-O's Use Of Heavyweight, Small-Pore Mesh Caused Plaintiff's Pain.

Ethicon's Medical Director, Dr. Hinoul, testified that heavyweight, small-pore meshes are disfavored because their greater mass causes more foreign body reaction, more scarring and more shrinkage and contraction of the mesh. [12 RR 5-7; 170:18-22; 171:14-172:1]. These, in turn, lead to pain. [12 RR 171:14-172:1]. Consistent with Dr. Hinoul's testimony, the jury heard and saw evidence that Plaintiff's explanted mesh was encased in scar tissue that had bridged over the mesh causing it to contract down. [9 RR 141:9-22; 142:5-16]. And while the Court of Appeals cited testimony from Dr. Lemack that he had not found scarring "over and above" what he expected to find [Opinion, p. 18], the task of weighing this competing evidence was entrusted to the jury who reasonably decided that the TVT-O's mesh weight and pore size was a producing cause of Plaintiff's injuries.

The TVT-O's heavyweight, small-pore mesh was also the cause of Plaintiff's groin pain. The jury heard evidence that, in one study series, groin pain was the most prevalent complaint or complication reported in the first six month after a TVT-O was implanted. [9 RR 98:5-11]. Groin pain was reported by 24.4 percent of women and was nearly ten times greater (16 %) for TVT-O users when

14

compared to patients implanted with the TVT (1.5 %). [9 RR 97:9-98:3]. This is because heavyweight small-pore meshes become encased in scarring which leads to contraction, and the "scarring and pulling and contracting" of the mesh arms in the obturator foramen causes groin pain. [9 RR 134:1-9; 142:5-16]. Two physicians who separately examined Plaintiff both found symptomology indicating sling-related groin pain: Dr. Margolis testified that Plaintiff exhibited bilateral groin tenderness at the exit wound locations in the obturator foramen area. [9 RR 126:5-21] and Dr. Lemack noted the same groin pain which he attributed to the TVT-O because Ms. Batiste exhibited tenderness over the areas of sling and that her pain was "very typical of patients who have groin pain after an obturator sling." [14 RR 125:14-126:1] These findings, together with his review of Ms. Batiste's medical records and his knowledge of mesh-related injuries, lead Dr. Margolis to testify that to a reasonably degree of medical certainty, Ms. Batiste's groin pain was attributable to defects in the TVT-O. [9 RR 127:23-128:11]. The jury could reasonably have credited this testimony.

## CONCLUSION AND PRAYER

Petitioner requests the Court grant her petition, reverse the judgment of the court of appeals, and remand this case for consideration of the remaining appellate arguments not addressed therein in the court of appeal's Opinion.

Respectfully submitted,

/s/Tim K. Goss
**Tim K. Goss**
Texas Bar No. 08222660
tim@freeseandgoss.com
**Freese & Goss, PLLC**
3031 Allen St., Ste. 200
Dallas, TX  75204
P:  214.761.6610
F:  214.761.6688


**Richard A. Capshaw**
State Bar No. 03783800
richard@capslaw.com
**Capshaw & Associates**
3031 Allen St., Ste. 201
Dallas, TX  75204
P:  214.761.6610
F:  214.761.6611


**David P. Matthews**
Texas Bar No. 13206200
dmatthews@thematthewslawfirm.com
**Matthews and Associates**
2509 Sackett St.
Houston, TX  77098
P:  713.522.5250
F:  713.535.7184


**Peter de la Cerda**
Texas Bar No. 24045769
peter@edwardsdelacerda.com
**Edwards & de la Cerda, P.L.L.C.**
3031 Allen St., Ste. 100
Dallas, TX  75204
P:  214.550.5239
F:  214.722.2101

16

**ATTORNEYS    FOR    PETITIONER**

17

## CERTIFICATE OF COMPLIANCE

This brief was prepared using Microsoft Word 2013 in Times New Roman font. The font size in the text is 14-point and footnotes is 12-point. This brief contains 4,499 words, not counting the sections excluded by Tex. R. App. P.9.4(i)(1).

/s/Tim K. Goss
Tim K. Goss

## CERTIFICATE OF SERVICE

This certifies that on the 18th day of December, 2015, a copy of the foregoing Petition for Review was electronically filed with the Clerk of the Court through the Court's electronic filing system which will send notice and a copy of this petition to all registered counsel in this case.

**Attorneys for Johnson & Johnson and Ethicon, Inc.:**

Charles C. Lifland
O'Melveny & Myers LLP
400 South Hope Street,
18th Floor
Los Angeles, CA 90071
Telephone (213) 430-6665
Fax: (213) 430-6407
clifland@omm.com

Scott P. Stolley
Cherry Petersen Landry Albert, LLC
Campbell Centre 8350 N. Central
Expressway, Suite 1500
Dallas, TX 75206
Telephone: (214) 265-9268
Fax: (214) 265-7008
sstolley@cplalaw.com

David R. Noteware
Thompson & Knight LLP
1722 Routh St., Ste. 1500
Dallas, TX 75201
David.Noteware@tklaw.com

Stephen D. Brody
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, DC 20006
Telephone: (202) 383-5167
Fax: (202) 383-5414
sbrody@omm.com

/s/Tim K. Goss
Tim K. Goss

19

# **APPENDIX**

TAB

1.      Judgment of the trial court, dated April 3, 2014.

2.      Memorandum Opinion of the Court of Appeals, dated November 5, 2015.

3.      Judgment of the Court of Appeals, dated November 5, 2015.

4.      Jury charge and verdict.

5.      TEX. CIV. PRAC. & REM. CODE § 82.005.

6.      RESTATEMENT (SECOND) OF TORTS § 402A.

**TAB 1**

No. DC-12-14350-D

452D
C 0023

| LINDA BATISTE, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JOHNSON & JOHNSON and | § | |
| ETHICON, INC., | § | |
| | § | |
| Defendants. | § | 95TH JUDICIAL DISTRICT |

## FINAL JUDGMENT

The Court called this case to trial on March 17, 2014. Plaintiff Linda Batiste appeared in person and through counsel and announced ready. Defendants Johnson & Johnson and Ethicon, Inc., appeared through counsel and announced ready.

Following the voir dire examination of the venire, the Court duly swore and empaneled a jury, consisting of twelve citizens good and true, that heard the admissible evidence. At the conclusion of the presentation, the Court submitted its Charge to the jury, which was followed by the closing arguments of the lawyers. Thereafter, the jury returned a ten-to-two verdict in favor of Plaintiff Linda Batiste and against Defendants Johnson & Johnson and Ethicon, Inc. Following a jury poll, the Court received and accepted the jury's verdict, which is incorporated by reference as if fully set forth herein.

Having considered the verdict of the jury, the evidence and the argument of counsel, it is hereby,

FINAL JUDGMENT - Page 1

**ORDERED, ADJUDGED AND DECREED** that Plaintiff Linda Batiste do have and recover of and from Defendants Johnson & Johnson and Ethicon, Inc., the sum of $1,200,000 for her damages, together with pre-judgment interest thereon at the rate of five percent per annum on $100,000 of that amount from the initial accrual date of June 12, 2013, until the day prior to the rendition of this Judgment.

It is further **ORDERED, ADJUDGED AND DECREED** that costs of this proceeding are taxed against Defendants Johnson & Johnson and Ethicon, Inc.

It is further **ORDERED, ADJUDGED AND DECREED** that this Judgment shall bear interest on all amounts awarded at the rate of five percent per annum from the date of this Final Judgment until the Judgment is satisfied.

It is further **ORDERED, ADJUDGED AND DECREED** that Plaintiff Linda Batiste shall have and is allowed all writs and processes necessary for the enforcement of this Judgment.

It is further **ORDERED, ADJUDGED AND DECREED** that all relief requested by any party that is not expressly granted or denied in this Judgment is **DENIED**.

This Judgment finally disposes of all parties and all claims and is appealable.

Signed this 3 day of April 2014.

KEN MOLBERG
Judge, 95th District Court

FINAL JUDGMENT - Page 2

5338

**TAB 2**

**REVERSE and RENDER; and Opinion Filed November 5, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-14-00864-CV

**JOHNSON & JOHNSON AND ETHICON, INC., Appellants**
**V.**
**LINDA BATISTE, Appellee**

**On Appeal from the 95th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-14350**

## MEMORANDUM OPINION

Before Justices Lang, Fillmore, and Whitehill
Opinion by Justice Fillmore

This product liability case involves the TVT-Obturator (TVT-O), a medical device manufactured and sold by appellants, Johnson & Johnson and Ethicon, Inc., to treat stress urinary incontinence (SUI).[1] SUI is the involuntary loss of urine when the bladder is put under stress such as from sneezing, coughing, laughing, or exercising. The TVT-O contains a tape made of polypropylene mesh. Using a helical trocar, or curved needle, a surgeon pulls the tape through incisions in the anterior wall of a woman's vagina, through the obturator foramen,[2] and out through incisions in the woman's inner thighs. The tape remaining in the body forms a hammock underneath the urethra to help prevent the leakage of urine.

---

[1] The jury was instructed to treat Johnson & Johnson and Ethicon, Inc. as if they are a single entity. We shall do the same in this opinion.

[2] The obturator foramen is an opening situated between the ischium and pubis of the hip bone. http://www.merriam-webster.com/medlineplus (accessed through https://nlm.nih.gov) (last visited on Nov. 3, 2015). The obturator foramen is closed by the obturator membrane, except for a small opening for the passage of the obturator vessels and nerve. *Id.*

Dr. John McNabb implanted a TVT-O into Linda Batiste to treat her SUI. Batiste subsequently sued appellants, alleging she was injured by the polypropylene mesh. Ten members of the jury found a design defect in the TVT-O caused Batiste's injuries and awarded her $1.2 million in damages. The trial court rendered judgment based on the jury's verdict.

Appellants first request that we reverse the trial court's judgment and render judgment that Batiste take nothing because she failed to present legally sufficient evidence the TVT-O is unreasonably dangerous, there is a safer alternative design, or that a specific defect in the TVT-O was a producing cause of her injuries and because there are no facts of record to rebut the statutory presumptions that appellants are not liable for any alleged defect in the TVT-O. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 82.008(a), (c) (West 2011).[3] In the alternative, appellants request we reverse the trial court's judgment and remand the case for a new trial because the trial court erred by: (1) excluding all evidence referencing the Food and Drug Administration (FDA), including FDA approval or clearance of any medical device, and of position statements issued by independent associations and societies of medical professionals concerning the safety and efficacy of synthetic mesh slings, and (2) admitting evidence of other lawsuits complaining about

---

[3] Section 82.008 provides, in relevant part:

(a) In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or design complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the product at the time of manufacture and that governed the product risk that allegedly caused harm.

\* \* \*

(c) In a products liability action brought against a product manufacturer or seller, there is a rebuttable presumption that the product manufacturer or seller is not liable for any injury to a claimant allegedly caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product was subject to pre-market licensing or approval by the federal government, or an agency of the federal government, that the manufacturer complied with all of the government's or agency's procedures and requirements with respect to pre-market licensing or approval, and that after full consideration of the product's risks and benefits the product was approved or licensed for sale by the government or agency. The claimant may rebut this presumption by establishing that:

(1) the standards or procedures used in the particular pre-market approval or licensing process were inadequate to protect the public from unreasonable risks of injury or damage; or

(2) the manufacturer, before or after pre-market approval or licensing of the product, withheld from or misrepresented to the government or agency information that was material and relevant to the performance of the product and was causally related to the claimant's injury.

TEX. CIV. PRAC. & REM. CODE ANN. § 82.008(a), (c).

–2–

the TVT-O and other medical devices manufactured by appellants and of "issue reports" involving other patients. Because Batiste failed to offer legally sufficient evidence that any alleged defect in the TVT-O was the producing cause of her injuries, we reverse the trial court's judgment and render judgment that Batiste take nothing. Based on this conclusion, we need not address appellants' remaining complaints. *See* TEX. R. APP. P. 47.1.

## Background[4]

Batiste has a complex medical history. She has had nine abdominal surgeries, including two "C-sections," two open abdominal procedures, and five laparoscopic procedures, which have left significant scarring. In 2003, she had a stroke that left her disabled. She had a second stroke in 2007. She has weakness on her left side as well as some loss of memory as a result of the two strokes. Due to spinal disease, she has undergone four surgeries in her lower back and one surgery in her neck. Following a heart attack, a stent was placed through her femoral artery to address a ninety-five percent blockage in her right coronary artery.

Batiste has been diagnosed with chronic obstructive pulmonary disease, a result of smoking. She suffers from poorly controlled diabetes, which is the probable cause of her diabetic neuropathy, or damage to her nerves that results in pain in her extremities, and of her peripheral vascular disease. Batiste is periodically afflicted with gout and shingles, and she suffers from arthritis. She has also had a clitoral cyst and a groin cyst. For a number of years, Batiste has complained to medical providers about her abdominal, back, hip, and leg pain and has been prescribed pain medication in an attempt to alleviate her pain.

Batiste began suffering from incontinence in 1993. Initially, her incontinence was just "dribbles," but the condition worsened over time and became "life-altering." In 2005, Batiste

---

[4] Because our opinion addresses only whether Batiste presented legally sufficient evidence that a defect in the TVT-O caused her injuries, we recite only those facts necessary to address this issue. Further, the applicable standard of review requires us to review the evidence in the light most favorable to the jury's verdict. Therefore, we have not recounted much of the evidence presented at trial that does not support the jury's verdict.

discussed with a physician the possibility of "tacking her bladder" to address her incontinence, but decided not to have the procedure. Ultimately, Batiste needed to use up to seven pads during the day and "pull-ups" at night due to urine leakage. On occasion, she would become incontinent during sexual intercourse, impeding her desire to engage in sexual activities. In 2010, she sought medical help for her incontinence from McNabb. McNabb treated the SUI by implanting a TVT-O into Batiste in January 2011. McNabb also performed an anterior colporrhaphy, a surgical procedure to repair a cystocele, or prolapse of Batiste's bladder.[5] To repair the cystocele, McNabb made an incision in Batiste's vagina and used sutures to raise her bladder and hold it in place. In August 2011, Batiste had her last back surgery and, in October 2011, suffered the heart attack that led to the implantation of the stent in her right coronary artery. Although Batiste's medical records do not indicate she complained to her health care providers about groin or pelvic pain between February 2011 and October 2011, she complained about groin pain following the implantation of the stent in her coronary artery. At trial, Batiste testified she has suffered from groin, pelvic, vaginal, and urethral pain since shortly after the TVT-O was implanted.

In June 2012, Batiste saw Dr. Kathryn Brown, a gynecologist, who took over the majority of McNabb's patients. Batiste complained of bladder, pelvic, back, knee, and right flank pain. Batiste indicated that when she urinated or had a bowel movement, and when she had sexual intercourse, the pain was "off the charts." When Brown examined Batiste, she found a "very small" mesh erosion on the left sidewall of Batiste's vagina. Brown described the size of the erosion as "barely the tip probably of your little finger." Without using an anesthetic, Brown

---

[5] A prolapse occurs when an organ falls or slips from its usual position. http://www.merriam-webster.com/medlineplus. In this case, Batiste's bladder was bulging into her vagina.

–4–

grasped the "end of the tip" of the mesh that was visible with a hemostat and cut it off. After the piece of mesh was removed, Brown could not feel any additional mesh in Batiste's vagina.

In May 2013, Batiste saw Dr. Gary Lemack, a urologist with specialty training in female pelvic medicine and pelvic reconstructive surgery, and complained of incontinence, dyspareunia or painful intercourse, and vaginal, groin, and pelvic pain. During his examination of Batiste, Lemack determined she had tenderness "overlying the areas of the sling." Lemack removed a portion of the polypropylene mesh from under Batiste's urethra in September 2013, but was unable to remove the ends of the tape that descended into her thighs. Lemack has removed "a lot of meshes," and the removal of Batiste's mesh "wasn't one of the more difficult ones." Lemack did not see any evidence of infection, inflammatory cells, "giant cells," or nerve entrapment when he removed the mesh. He saw "normal" fibrous tissue and smooth muscle and did not find any evidence of scarring other than what he would expect from the implantation of the TVT-O.

Batiste asserted claims of negligence against McNabb and appellants. Batiste also asserted strict liability claims of design, manufacturing, and marketing defects against appellants. Because McNabb had been diagnosed with early-onset Alzheimer's disease, he was not deposed. In response to requests for admission, appellants denied they were blaming McNabb for "complications" or contending either that McNabb was at fault in choosing to implant the TVT-O into Batiste or caused or contributed to cause the injuries claimed by Batiste. The trial court granted McNabb's no evidence motion for summary judgment and dismissed Batiste's claims against him. The jury was instructed McNabb was disabled and unable to testify.

After a trial lasting four weeks, Batiste nonsuited her manufacturing defect and negligence claims against appellants, leaving her strict liability claims of design and marketing defects as her operative causes of action. As relevant to this appeal, Batiste argued to the jury that the TVT-O was defectively designed because: (1) the mesh was heavyweight and contained

small pores; (2) the mesh was mechanically cut, rather than being cut by a laser, which caused it to curl, fray, and rope; and (3) the mesh oxidized, or degraded, and lost particles after it was implanted. The jury found against Batiste on her marketing defect claim. Ten members of the jury found there was a design defect in the TVT-O that was a producing cause of Batiste's injuries and awarded Batiste $1.2 million in damages.

**Analysis**

In their first issue, appellants argue they are entitled to a take-nothing judgment because Batiste failed to present legally sufficient evidence the TVT-O is unreasonably dangerous, there is a safer alternative design to the TVT-O, or that a specific defect in the TVT-O was a producing cause of her injuries and because there are no facts of record to rebut the statutory presumptions that appellants are not liable for any alleged defect in the TVT-O. We first consider appellants' complaint that there is legally insufficient evidence a defect in the TVT-O was a producing cause of Batiste's injuries. Appellants specifically argue Batiste only offered evidence that the TVT-O itself, rather than a defect in the device, was a producing cause of her injuries and failed to exclude other possible causes of her injuries.

In her opening brief, Batiste argued she was not required to prove a specific defect caused her injuries and that, under the common law, her "burden was to show that the TVT device was defective, and that it injured her."[6] Batiste contended she carried that burden because the evidence established the implantation of a TVT-O could potentially cause a number of complications, including dyspareunia, pelvic, groin, and leg pain, and erosion of the mesh, and that she suffered from those complications. Following oral argument, Batiste filed a post-

---

[6] The jury charge asked whether there was a "design defect in the TVT-O at the time it left the possession" of appellants that "was a producing cause of injury" to Batiste. Batiste did not object to this charge, and we question whether she preserved this argument for appeal. Regardless, Batiste's assertion she was required to establish only that the TVT-O, and not some defect in it, caused her injuries fails because, as explained *infra*, Texas law requires a plaintiff in a strict liability design defect case to show both the defective condition of a product and a causal connection between that defect and the plaintiff's injuries.

submission brief on the issue of specific causation. Batiste asserted the evidence shows: (1) defects in the TVT-O are known to cause particular conditions and injuries, (2) she suffers from those same conditions and injuries, and (3) qualified experts opined, based on their review of her medical history, that defects in the TVT-O caused her injuries.

*Standard of Review*

When an appellant challenges the legal sufficiency of the evidence on an issue on which it did not have the burden of proof at trial, it must demonstrate on appeal that there is no evidence to support the adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 215 (Tex. 2011). The ultimate test for legal sufficiency is whether the evidence "would enable reasonable and fair-minded people to reach the verdict under review." *Exxon Corp.*, 348 S.W.3d at 215 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). A legal sufficiency challenge fails if there is more than a scintilla of evidence to support the judgment. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *see also Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014). Evidence that is so weak as to do no more than create a mere surmise or suspicion that the fact exists is less than a scintilla. *Kia Motors Corp.*, 432 S.W.3d at 875. In conducting our review, we view the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *City of Keller*, 168 S.W.3d at 822. We "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Exxon Corp.*, 348 S.W.3d at 215 (quoting *City of Keller*, 168 S.W.3d at 827). We are mindful in our review that jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819.

*Applicable Law*

To recover on a product liability claim based on an alleged design defect, "a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery." *Genie Indus., Inc. v. Matak*, 462 S.W.3d 1, 6 (Tex. 2015) (quoting *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)). "Producing cause" is a substantial factor in bringing about the injury and without which the injury would not have occurred. *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 541 & n.3 (Tex. 2011) (citing *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 46 (Tex. 2007)). A producing cause must be a cause-in-fact. *Id.* at 541; *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995). A finding of cause-in-fact may be based on either direct or circumstantial evidence, but cannot be supported by mere conjecture, guess, or speculation. *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003).

Generally, proving the existence of a design defect requires competent expert testimony and objective proof that the defect the plaintiff has identified caused the injury. *Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 137 (Tex. 2004); *In re Zimmer*, 451 S.W.3d 893, 906 (Tex. App.—Dallas 2014, orig. proceeding). Proof other than expert testimony will constitute some evidence of causation only when "a layperson's general experience and common understanding would enable the layperson to determine from the evidence, with reasonable probability, the causal relationship between the event and the condition." *Mack Trucks Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006). The parties do not dispute that expert testimony was necessary in this case to establish causation. *See Lewis v. Johnson & Johnson*, 601 Fed. App'x 205, 211 (4th Cir. 2015) (per curiam).

An expert is required to explain the basis of his statements to link his conclusions to the facts. *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999); *Damian v. Bell Helicopter Textron, Inc.*, 352 S.W.3d 124, 148 (Tex. App.—Fort Worth 2011, pet. denied). There cannot be too great an "analytical gap" between the expert's opinion and the facts upon which he relies, *Ledesma*, 242 S.W.3d at 39, and "a claim will not stand or fall on the mere *ipse dixit* of a credentialed witness." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999). An expert who is attempting to determine causation must also carefully consider alternative causes. *E.I. DuPont Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 558–59 (Tex. 1995); *see also Kia Motors Corp.*, 432 S.W.3d at 878 (expert should exclude "'other plausible causes' presented by the evidence" (quoting *Transcontinental Ins. Co. v. Crump*, 330 S.W.3d 211, 218 (Tex. 2010)). Although a medical causation expert need not disprove or discredit every possible cause other than the one espoused by him, "if evidence presents 'other plausible causes of the injury or condition that *could* be negated, the [proponent of the testimony] *must* offer evidence excluding those causes with reasonable certainty.'" *Crump*, 330 S.W.3d at 218. The expert's failure to rule out other causes of the damage renders the opinion little more than speculation. *Robinson*, 923 S.W.2d at 559; *see also TXI Transp. Co. v, Hughes*, 306 S.W.3d 230, 237 (Tex. 2010) ("An expert's failure to rule out alternative causes of an incident may render his opinion unreliable."). Even if it is not objected to, expert testimony that is conclusory, speculative, or based on assumed facts contrary to the evidence is legally insufficient to support a verdict. *City of San Antonio v. Pollock*, 284 S.W.3d 809. 816 (Tex. 2009); *Ford Motor Co. v. Wiles*, 353 S.W.3d 198, 202 (Tex. App.—Dallas 2011, pet. denied).

*Alleged Defects*

At trial, Batiste identified three alleged defects in the TVT-O: (1) the use of heavyweight, small-pore mesh; (2) the use of mesh that was cut by a machine, rather than a laser; and (3) the use of mesh that could degrade and lose particles.

## Mechanically Cut Mesh

When appellants began manufacturing the TVT-O, the polypropylene mesh used in the device was cut mechanically with, essentially, a large blade. Appellants received reports and complaints from physicians about the rough edges of the mesh. Testing by appellants confirmed that, when put under sufficient tension, the edges of the mechanically cut mesh could curl, fray, and rope.[7] Appellants thereafter began manufacturing a TVT-O in which the mesh was cut with a laser. The laser sealed the edges of the mesh, preventing it from curling, fraying, or roping.

Appellants continued to sell a TVT-O product containing the mechanically cut mesh. Batiste presented evidence from which the jury could infer that appellants continued to sell a TVT-O product containing mechanically cut mesh so that, in marketing the TVT-O, they could rely on clinical data that had accumulated over a number of years relating to the TVT-O and a predecessor product, the TVT, that also used the mechanically cut mesh. Appellants offered evidence they continued to sell a TVT-O product with mechanically cut mesh because some physicians preferred the product. There was no evidence of any study that found fewer complications arose in patients from the laser cut mesh than from the mechanically cut mesh.

## Heavyweight, Small-Pore Mesh

The polypropylene mesh in the TVT-O contains a number of pores. Tissue grows through the pores to incorporate the mesh into the body. There will necessarily be a certain amount of scar tissue associated with this process. There could be a greater foreign body

---

[7] In the test, the mesh was elongated by fifty percent of its original length.

reaction to a heavyweight, small-pore mesh than to a lightweight, large-pore mesh, leading to more scar tissue, shrinkage and contraction of the mesh, and inflammation. Appellants manufacture meshes that are lighter weight and have larger pores than the polypropylene mesh used in the TVT-O. These meshes, however, are used for other purposes, such as hernia repairs, and there was no evidence that any mid-urethral synthetic sling sold in the United States has a lighter weight, larger-pore mesh than the TVT-O. Prior to Batiste's surgery, appellants began producing a mid-urethral sling that used a smaller amount of the polypropylene mesh than used in the TVT-O.

Degradation and Particle Loss

Dr. Howard Jordi, a polymer chemist, testified polypropylene sutures, which are made of the same material used to make the TVT-O mesh, have been the "suture of choice" for many surgeons since the 1960s and are probably in millions of people. Jordi and Dr. Shelby Thames, who is also a polymer chemist, testified polypropylene can degrade through oxidation. Jordi and Thames discussed a study performed by appellants in which the polypropylene sutures manufactured by appellants, as well as sutures made by other manufacturers and of different materials, were implanted into dogs. Although Thames disagreed with the findings, the study concluded the polypropylene sutures manufactured by appellants showed signs of degradation after five years. Appellants removed additional sutures from the dogs after seven years and confirmed there were signs of degradation. Jordi also testified about other studies that showed polypropylene mesh or fibers could degrade in the human body.

The mesh that was removed from Batiste was placed into formalin, a formaldehyde solution, and preserved. Jordi testified the formalin hardens the tissue on the mesh to assist a pathologist in making slides of the tissue. A reaction between the formalin and the tissue forms a new cross-linked polymer that can coat the mesh. Jordi described the new cross-linked polymer

–11–

as "hard." Jordi testified he observed surface cracking on the sample of the mesh removed from Batiste and concluded the polypropylene had degraded. There was evidence that degradation of the polypropylene could enhance the opportunity for infection and increase inflammation. Jordi admitted, however, there could be degradation from the polypropylene that would have no clinical significance in a patient, and there was no evidence as to how much the polypropylene would have to degrade before it caused injury to a patient.

As to particle loss, appellants were aware, prior to manufacturing the TVT-O, that when the mesh was put under sufficient tension, small particles of polypropylene could break off the mesh. Some physicians noted the small particles could migrate in a woman's vagina and cause pain during intercourse. Jordi sent the sample of the mesh removed from Batiste to a lab where it was rolled onto a substrate. The particles that fell from the sample were collected. According to Jordi, an analysis showed the vast majority of the particles were polypropylene.

*Causation Evidence*

The jury heard evidence the TVT-O was a safe and effective treatment for SUI and was considered by many physicians to be the gold standard of surgical care for the treatment of SUI. However, although the frequency and severity of the complications in patients was disputed at trial, the evidence also established the implantation of a TVT-O to treat SUI can cause, among other complications, groin, leg, and pelvic pain and that there could be an erosion of the mesh into the vagina. Appellants assert Batiste's causation evidence established only that the TVT-O, rather than a defect in the device, was a potential cause of her injuries and failed to exclude other potential causes of the injuries. Batiste contends the evidence established that she suffered from complications caused by the TVT-O and there is more than a scintilla of evidence the use of mechanically cut mesh caused the erosion she suffered in 2012 as well as her urethral pain,

–12–

particle loss caused her pelvic pain, and heavyweight, small-pore mesh caused her pelvic and groin pain.[8]

<u>Erosion and Urethral Pain</u>

Batiste first points to evidence that she suffered a painful erosion of the mesh into her vagina in 2012. Batiste argues the mesh erosion could occur only after the implantation of the TVT-O device, there was evidence erosions are caused by the curling, fraying, and roping of mechanically cut mesh, the TVT-O implanted in her contained mechanically cut mesh, and the mesh removed from her body reflected curling, fraying, and roping.

Brown did not testify as to whether she observed any curling, fraying, or roping of the mesh when she removed the portion of the mesh that had eroded into Batiste's vagina in June 2012 and described what she removed as the "end of the tip" of the mesh. After she removed the visible mesh, Brown could not feel any other mesh in Batiste's vagina. When asked her opinion about the possible cause of the erosion, Brown identified Batiste's status as a smoker, noting smokers do not heal as well as non-smokers. She also testified Batiste had vaginal atrophy, or a thinning of the vaginal tissue due to a loss of estrogen that is common in post-menopausal women.

Lemack testified mesh exposes or extrudes because it is infected, the closing of the vagina "didn't hold up over time," or the mesh was too close to, or not in the right layer of, the vaginal mucosa. Although he had implanted a number of mid-urethral synthetic slings, Lemack had never seen fraying "with this mesh" and had not "medically" seen fraying with any mesh.

---

[8] Although there was evidence that Batiste also suffers from dyspareunia, she has not specifically asserted on appeal that the evidence was legally sufficient to support a finding this injury was caused by a defect in the TVT-O. We note that, although there was evidence the erosion of the mesh potentially contributed to Batiste's dyspareunia, there was also evidence Batiste's smoking and vaginal atrophy, as well as the placement of the sling, were potential causes. Batiste's expert failed to rule out these other potential causes of her dyspareunia. *See Robinson*, 923 S.W.2d at 559; *see also Kia Motors Corp.*, 432 S.W.3d at 878.

Dr. Thomas Margolis, an obstetrician/gynecologist with a sub-specialty in pelvic reconstructive surgery, testified he implants organic slings in women to treat SUI. These slings are made from animal or cadaver tissue or tissue from the patient's abdomen or leg. He has never implanted a synthetic, polypropylene sling to treat SUI. He has, however, removed a number of polypropylene slings from patients who were having complications from the sling. Margolis has seen fraying and roping of the mesh that he has removed from other women.

According to Margolis, the defects in the TVT-O include:

> defects that are specific to the material itself, the sling itself, this here, are roping, curling, fraying, particle loss, degradation, and then in and of itself the passage of the helical trocar through the obturator foramen, the risks of injury to the obturator neurovascular bundle and the muscles and the urogenital diaphragm and the obturator diaphragm, all of the structures, the me– the body parts, if you will, that this thing goes through that can damage them.

"Complications from the mesh" that Margolis sees on a regular basis are "erosions, infections, obstructions, contraction, damage to adjacent organs, inflammation, scarring, loss of function, pain, loss of leg function, dyspareunia."

Based on photographs taken by Jordi, Margolis testified he saw curling, fraying, and roping of the sample of the mesh removed from Batiste's body. Jordi, however, did not receive this sample until sometime after Lemack removed the mesh in September 2013. Photographs of the mesh taken at least fifteen months after the erosion was removed are no evidence that any curling, fraying, and roping observed by Margolis were present in June 2012 when Brown removed the portion of the mesh that had eroded into Batiste's vagina. Further, as previously discussed, after the mesh was removed from Batiste, it was placed into formalin and a new cross-linked polymer was formed on the mesh. Accordingly, when Jordi photographed the mesh, it was not in the same condition as when it was in Batiste's body.

Although there was evidence curling, fraying, and roping of the polypropylene mesh in the TVT-O could cause an erosion, there was no evidence the mesh inside Batiste had curled,

frayed, or roped at the time the erosion was removed in 2012. *See Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 840 (Tex. 2010) (per curiam) (evidence that allegedly defective halogen lamps could cause fires generally does not establish the lamp in question caused a particular fire). Further, there were a number of other potential causes of the erosion suffered by Batiste, including poor healing due to her status as a smoker, vaginal atrophy, the closing of the vagina over the mesh failing to "hold up," infection, or the placement of the mesh too close to the vaginal mucosa. Batiste failed to offer expert testimony excluding any of these possible causes for the erosion. *See id*. at 839–40. Accordingly, the evidence is legally insufficient to support a finding the erosion of the mesh suffered by Batiste in June 2012 was due to curling, roping, or fraying of mechanically cut mesh of the TVT-O.

Relying on Margolis's testimony, Batiste next asserts there is more than a scintilla of evidence that curling, fraying, or roping of the mechanically cut mesh caused her urethral pain. Lemack testified Batiste exhibited tenderness overlying the areas of the sling prior to the removal of the mesh. However, when Lemack removed a portion of the mesh from Batiste, he found no evidence of any erosion or extrusion of the mesh into the bladder or the urethra, no inflammation, and no scarring beyond what was expected from the implantation of a foreign device. Further, as set out above, Lemack has never seen any fraying of the TVT-O mesh, implying he did not see any fraying of the mesh he removed from Batiste. Lemack testified he was unable to determine whether Batiste's urethral pain was more likely caused by the TVT-O mesh or some other condition.

Margolis examined Batiste during trial and found that her urethra was scarred and tender. Although Margolis did not testify specifically about the cause of Batiste's urethral pain, he opined that, to a reasonable degree of medical certainty:

–15–

> [t]he pain and symptoms that I elicited and identified on examination and the signs and the findings were all from the sling and its complications, including scarring, erosion, and contracture with particle loss, they were all from the sling.

Margolis's opinion that the "sling" caused Batiste's "pain and symptoms" does not link the urethral pain to any curling, fraying, or roping of the mesh in the TVT-O and will not support the verdict. *See Ledesma*, 242 S.W.3d at 39–40; *Burrow*, 997 S.W.2d at 235 (*ipse dixit* of credentialed expert will not support judgment). Further, Margolis testified the passage of the helical trocar through the body could damage the area that it went through; however, he failed to exclude this possible damage as a cause of Batiste's urethral pain. *See Kia Motors Corp.*, 432 S.W.3d at 878; *Merrell*, 313 S.W.3d at 840 ("An expert's failure to explain or adequately disprove alternative theories of causation makes his or her own theory speculative and conclusory."). We conclude there is no evidence any curling, fraying, or roping of the mesh was a cause-in-fact of Batiste's urethral pain.

<u>Pain from Degradation and Particle Loss</u>

Relying on Jordi's and Margolis's testimony, Batiste next asserts there is more than a scintilla of evidence that her pelvic pain was caused by degradation of, and particle loss from, the mesh. As to degradation of the mesh, Jordi, based on his observations, and Margolis, based on photographs taken by Jordi, testified the mesh removed from Batiste showed signs of surface degradation. However, as discussed above, there is no evidence as to the amount of degradation that must occur before it has any clinical significance in a patient, and there is no evidence the mesh that was placed inside of Batiste had degraded to the extent that it caused her injury.

As to particle loss from the mesh, there was evidence the mesh could lose particles. Further, some physicians who observed particle loss from the mesh concluded the particles could migrate, causing pelvic pain and dyspareunia. Jordi testified that, although he saw some "covering" of the sample of the mesh removed from Batiste with the cross-linked polymer that

formed when the mesh was placed into formalin, there were some areas of the sample that were not covered by the new polymer. Jordi observed degradation on the surface of the polypropylene fibers and there were "large cracks [which] would appear to be regions where there may have been some flaking off." Jordi testified that if polypropylene flakes off the fibers, "it goes into the tissue of the person that it's implanted in" and can cause inflammation. Margolis, based on photographs taken by Jordi, testified he saw particle loss from the mesh removed from Batiste.

A lab that Jordi sent the sample to rolled the sample on a piece of paper and analyzed the flakes of material that fell from the sample. According to Jordi, the vast majority of the particles were polypropylene. Jordi testified his colleague cleaned the sample by holding it between forceps and, using tweezers, removing as much of the tissue remaining on the mesh as possible. According to Jordi, his colleague also may have held the sample down using a tool similar to a spatula and, to some degree, there was a "bending" of the fibers in the mesh during the cleaning process. Accordingly, the sample from which the particles were obtained was not in the same condition as when it was removed from Batiste's body due to the presence of the cross-linked polymer that had formed on the sample after it had been removed from Batiste's body and the fact the sample had been subjected to extensive handling.

Lemack testified he has never seen any particle loss from mesh slings, including mesh manufactured and sold by appellants, leading to the conclusion that he did not see particle loss when he removed a portion of the mesh from Batiste. Further, when Lemack removed the mesh from Batiste, he saw no evidence of inflammation.

Lemack was unable to determine the cause of Batiste's pelvic pain but, based on Batiste's report of the timing of the manifestation of the pain, believed it was a "result of the sling." He also "suspected" that Batiste's groin pain led to pelvic floor muscle tightness which led to some degree of pelvic pain. Margolis globally testified Batiste's pelvic pain was caused by scarring,

erosion, contracture, inflammation, particle loss, roping, fraying, degradation, damage to adjacent structures, and damage to the nerve and soft tissue of Batiste's pelvis and that all of her pain was from "the sling" and its complications.

It is clearly established in the record that pelvic pain is a known possible complication from the implantation of a TVT-O. As noted, there was no evidence that surface degradation of the polypropylene fibers alone causes pelvic pain or of the amount of degradation that would have to occur before there would be any injury to a patient. Although there was evidence that particle loss from the mesh could cause pelvic pain, there was no evidence of any particle loss from the mesh while it was inside Batiste's body. Without evidence of particle loss inside of Batiste, Margolis's opinion that particle loss, among a host of other possible factors, was a cause of Batiste's pelvic pain is not linked to any case-specific facts and is conclusory. *See Pollock*, 284 S.W.3d at 816 (opinions of qualified expert that have no basis are conclusory and cannot support judgment); *City of Keller*, 168 S.W.3d at 813 ("In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla . . . if jurors would have to guess whether a vital fact exists."). We conclude there is no evidence any degradation of, or particle loss from, the mesh in the TVT-O was a producing cause of Batiste's pelvic pain.

<u>Pain due to Heavyweight, Small-Pore Mesh</u>

Batiste finally asserts the evidence established the use of a heavyweight, small-pore mesh caused her pelvic pain and the arms of the sling consisting of the same mesh caused her groin pain. Lemack believed the mesh used in the TVT-O was a large-pore mesh and did not express an opinion as to whether the weight of the mesh caused Batiste's groin or pelvic pain. When Lemack removed the mesh, he did not find any evidence of scarring "over and above" what he would have expected from the implantation of a foreign device. He saw "fibrous tissue," which

–18–

is "a normal reaction to the pelvic mesh" and smooth muscle. He saw no evidence of inflammation or nerve entrapment.

Based on the history given by Batiste,[9] Lemack believed her groin pain "was caused by the implantation of the TVT-O sling."[10] However, Lemack was not aware that Batiste had an anterior colporrhaphy at the same time the TVT-O was implanted. In Lemack's opinion, if Batiste continued to have pain after he removed the mesh, it was impossible to "absolutely know" which procedure was causing the continued pain. It was also difficult for Lemack to determine the source of Batiste's pelvic pain but, based on Batiste's report of the timing of the manifestation of the pain, believed it was a caused by the implantation of the sling. He "suspected" that Batiste's groin pain led to pelvic floor muscle tightness which led to some degree of pelvic pain.

Based on photographs taken by Jordi of the sample of mesh removed from Batiste's body, Margolis testified he could see "fibrotic bridging" on the sample.[11] Margolis testified fibrotic bridging means:

> the scar that is supposed to sort of seal this in place has not just sealed it in place, but encased it in a big cake of scarring, really contracts it down and does more than just scar it in place. It scars over it, covers it with scar, and that's problematic because we don't want to see fibrotic bridging in this stuff.

According to Margolis, fibrotic bridging "increases the amount of scar, which increases the potential for damage to adjacent organs, increases the potential for obstruction, increases the potential for pain, and for erosion, and for all of the complications that we've talked about." Margolis testified Batiste's pelvic pain was caused by "scarring, erosion, contracture,

---

[9] Lemack did not have access to Batiste's prior medical records and relied only on the information she provided to him.

[10] Lemack noted that, if Batiste complained of groin pain prior to the surgery to implant the TVT-O or did not complain of groin pain until after her back surgery and heart procedure in 2011, "that would change things." He stated, "if the history is that she only – that she had no pain after her surgery but, in fact, had pain only after those procedures, the I would say it would change things. That's not what I was told."

[11] We again note that the sample of the mesh received by Jordi had been placed in formalin and a new cross-linked polymer had formed between the tissue on the sample and the formalin.

inflammation, particle loss, roping, fraying, degradation, damage to adjacent structures, damage to the nerves and the soft tissues of the female – of her pelvis."

Although Margolis testified a heavyweight, small-pore mesh could contract more than a lightweight, large-pore mesh, there was no evidence regarding the extent, if any, to which the mesh contracted inside of Batiste's body.[12]  Further, Margolis's testimony about fibrotic bridging established only that the scarring increased the potential for pain and other possible complications and did not establish fibrotic bridging caused any of Batiste's pelvic pain.  His remaining testimony about the cause of Batiste's pelvic pain essentially states the pain results from the sling.  This testimony does not tie Batiste's pelvic pain to the weight or pore size of the mesh and is insufficient to support a finding that the use of a heavyweight, small-pore mesh in the TVT-O was a producing cause of Batiste's pelvic pain.  *See Ledesma*, 242 S.W.3d at 39 (expert testimony is unreliable if "there is simply too great an analytical gap between the data and the opinion proffered"); *Pollock*, 284 S.W.3d at 816.

As to Batiste's groin pain, Lemack believed the pain was probably from the implantation of the sling, but did not link the pain to the weight or pore-size of the mesh.  In Margolis's opinion, the sling arm in Batiste's obturator foramen was:

> scarring and pulling and contracting.  And it may not be right on the nerve, but it's close enough to the nerve that it's kinking and pulling and gnawing on that thing, and it's going to cause pain as long as it's there.

Margolis's opinion on the cause of Batiste's groin pain is premised, not on the weight or pore size of the mesh, but on the placement of the arms of the slings near the obturator nerve.  There is no evidence the placement of the sling was due to the weight of mesh used in the TVT-O, and

---

[12] There was evidence that any mid-urethral sling, including slings made from organic materials, would contract to some extent after implantation.

Margolis did not link Batiste's groin pain to the mesh being either heavyweight or small-pore.[13] Further, Margolis identified the damage caused by passage of the helical trocar through the obturator foramen when the TVT-O was implanted as one possible cause of complications experienced after the implantation of a TVT-O, and failed to exclude this as a cause of Batiste's groin pain. *See Robinson*, 923 S.W.2d at 559; *see also Kia Motors Corp.*, 432 S.W.3d at 878. We conclude there is legally insufficient evidence that Batiste's pelvic or groin pain was due to the use of a heavyweight, small-pore mesh in the TVT-O.

## Conclusion

It is undisputed the implantation of a TVT-O for the treatment of SUI can cause a number of complications, including erosion of the mesh into the vagina and urethral, pelvic, and groin pain. It is also undisputed that Batiste suffered from these complications. However, "[t]he law of products liability does not guarantee that a product will be risk free." *Matak*, 462 S.W.3d at 6 (quoting *Caterpillar Inc. v. Shears*, 911 S.W.2d 379, 381 (Tex. 1995)). Rather, to recover on her product liability claim based on an alleged design defect in the TVT-O, Batiste was required to prove a specific defect in the TVT-O, and not simply the device itself, was the producing cause of her injuries. *See id.*

While proving causation may be difficult, that does not excuse the plaintiff from introducing some evidence of causation. *Schaefer v. Tex. Emp'r Ins. Ass'n*, 612 S.W.2d 199,

---

[13] As noted, Batiste suffered from a number of medical conditions that could have potentially caused her symptoms. Margolis testified he performed a differential diagnosis to "rule out what's not happening and rule in what is happening" for each of Batiste's symptoms. In doing so, he considered the temporal relationship between the symptom and the surgery to implant the TVT-O. He first ruled out the anterior colporrhaphy as a source of Batiste's pelvic pain or dypareunia, stating that, unless you excise too much vaginal wall, the patient will not suffer pelvic pain from the procedure. He then considered Batiste's back injuries and concluded any pain from those injuries would manifest in her buttocks or the back of her legs and would not present as groin, vaginal, urethral, or pelvic pain or as dyspareunia. Margolis also excluded surgeries to repair two abdominal hernias as being a "surgical mile" and a "surgical galaxy" away from the vagina. He finally concluded the cardiac catheterization during which a stent was implanted in Batiste did not cause her symptoms. However, Margolis failed to address a number of potential causes of Batiste's symptoms, such as her diabetic neuropathy, which could be a source of her pelvic pain, and the possibility she suffers from interstitial cystitis, which could explain her pelvic and groin pain. Finally, Lemack testified that he believed the placement of the sling could be causing some of Batiste's problems and Margolis acknowledged the passage of the sling through the obturator foramen could cause a number of Batiste's symptoms. Margolis failed to rule out the passage or the placement of the sling, as opposed to any defect in the sling, as being the cause of Batiste's groin or pelvic pain. *See Robinson*, 923 S.W.2d at 559; *see also Kia Motors Corp*, 432 S.W.3d at 878

205 (Tex. 1980). Although Batiste alleged the TVT-O was defective based on its use of mechanically cut, heavyweight, small-pore mesh that was subject to degradation and particle loss, she failed to produce more than a scintilla of evidence that any of these alleged defects caused her injuries. Accordingly, the evidence is legally insufficient to support the jury's verdict.

We resolve that portion of appellants' first issue in which they argue Batiste failed to present legally sufficient evidence that a defect in the TVT-O caused her injuries in their favor.[14] We reverse the trial court's judgment and render judgment that Batiste take nothing on her product liability claim against appellants based on a design defect in the TVT-O.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

140864F.P05

---

[14] Based on our resolution of appellants' argument that Batiste failed to present legally sufficient evidence of causation, we need not address appellants' remaining arguments in their first issue or their second issue. *See* TEX. R. APP. P. 47.1.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHNSON & JOHNSON AND ETHICON, INC., Appellant

No. 05-14-00864-CV    V.

LINDA BATISTE, Appellee

On Appeal from the 95th Judicial District Court, Dallas County, Texas,
Trial Court Cause No. DC-12-14350.
Opinion delivered by Justice Fillmore, Justices Lang and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that appellee Linda Batiste take nothing on her claims against appellants Johnson & Johnson and Ethicon, Inc.

It is **ORDERED** that appellants Johnson & Johnson and Ethicon, Inc. recover their costs of this appeal from appellee Linda Batiste.

Judgment entered this 5th day of November, 2015.

**TAB 3**



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JOHNSON & JOHNSON AND ETHICON, INC., Appellant

No. 05-14-00864-CV     V.

LINDA BATISTE, Appellee

On Appeal from the 95th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DC-12-14350. Opinion delivered by Justice Fillmore, Justices Lang and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that appellee Linda Batiste take nothing on her claims against appellants Johnson & Johnson and Ethicon, Inc.

It is **ORDERED** that appellants Johnson & Johnson and Ethicon, Inc. recover their costs of this appeal from appellee Linda Batiste.

Judgment entered this 5th day of November, 2015.

**TAB 4**

# ORIGINAL

FILED

2014 APR -2 AM 10: 32

GARY FITZSIMMONS
DISTRICT CLERK
DALLAS CO.. TEXAS
*Audrey Dellinger*
DEPUTY

No. DC-12-14350-D

| | | |
|---|---|---|
| LINDA BATISTE, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | DALLAS COUNTY, TEXAS |
| | § | |
| JOHNSON & JOHNSON and | § | |
| ETHICON, INC., | § | |
| | § | |
| Defendants. | § | 95TH JUDICIAL DISTRICT |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments of the attorneys, you will go to the jury room to decide the case, answer the questions that are included herein, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes that you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the Court's bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that no one can read what you wrote.

I shall now give you additional instructions which you should carefully and strictly follow during your deliberations.

**CHARGE OF THE COURT - Page 1**

1.  Do not let bias, prejudice or sympathy play any part in your deliberations.

2.  Base your answers only on the evidence admitted in Court and on the law that I have given you in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom. In your deliberations, you will not consider or discuss anything that is not represented by the evidence in this case.

3.  You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of the instructions and definitions I have given you in this Charge.

4.  If my instructions use a word in a way that is different from its ordinary meaning, you must use the meaning I have given you, which is a proper legal definition.

5.  All questions and answers are important. No one should say that any question or answer is not important.

6.  Answer "Yes" or "No" to all questions that require such an answer. A "Yes" answer must be based on a preponderance of the evidence, unless otherwise instructed. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence, unless otherwise instructed.

    **"Preponderance of the Evidence"** means the greater weight of credible evidence admitted in this case. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.  Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.  Do not answer questions by drawing straws or by any method of chance. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average. Do not trade your

**CHARGE OF THE COURT - Page 2**

answers. For example, do not say, "I will answer this question your way if you answer another question my way."

9.    Except where you are instructed otherwise, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

**"Producing cause"** means a cause that was a substantial factor in bringing about the injury and without which the injury would not have occurred. There may be more than one producing cause.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

In answering the following questions, you are further instructed that:

Johnson & Johnson and Ethicon, Inc., are to be treated by you as if they are a single entity.

"TVT-O" refers to the TVT-Obturator device.

A medical device manufacturer, like Johnson & Johnson/Ethicon, owes a duty to adequately warn a patient's prescribing physician about the device's risks. The manufacturer does not owe a duty to warn patients directly.

As I have said before, if you do not follow these instructions you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

**CHARGE OF THE COURT - Page 3**

## QUESTION 1

Was there a design defect in the TVT-O at the time it left the possession of Ethicon/Johnson & Johnson that was a producing cause of injury to Linda Batiste?

A "design defect" is a condition of the product that renders it unreasonably dangerous as designed, taking into consideration the utility of the product and the risk involved in its use. For a design defect to exist there must have been a safer alternative design in January 2011.

"Safer alternative design" means a product design other than the one actually used that in reasonable probability–

1. would have prevented or significantly reduced the risk of the injury in question without substantially impairing the product's utility, and

2. was economically and technologically feasible at the time the product left the control of Ethicon/Johnson & Johnson by the application of existing or reasonably achievable scientific knowledge.

Answer "Yes" or "No:"     __YES__

## QUESTION 2

Was there a defect in the marketing of the TVT-O at the time it left the possession of Ethicon/Johnson & Johnson that was a producing cause of injury to Linda Batiste?

A "marketing defect" with respect to the product means the failure to give adequate warnings of the product's dangers that were known or by the application of reasonably developed human skill and foresight should have been known or failure to give adequate instructions to avoid such dangers, which failure rendered the product unreasonably dangerous as marketed.

"Adequate" warnings and instructions mean warnings and instructions given in a form that could reasonably be expected to catch the attention of a reasonably prudent surgeon in the circumstances of the product's use; and the content of the warnings and instructions must be comprehensible to the average surgeon and must convey a fair indication of the nature and extent of the danger and how to avoid it to the mind of a reasonably prudent surgeon.

An "unreasonably dangerous" product is one that is dangerous to an extent beyond that which would be contemplated by the ordinary surgeon using the product with the ordinary knowledge common to the surgeon's medical community as to the product's characteristics.

Answer "Yes" or "No:"     _NO_

*(If you have answered "Yes" to either Question 1 or 2, then answer Question 3. Otherwise, do not answer Question 3.)*

## QUESTION 3

What sum of money, if paid now in cash, would fairly and reasonably compensate Linda Batiste for her injuries, if any, that resulted from the defective condition of the TVT-O?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include any amount for any condition not arising from the defective condition of the TVT-O, except to the extent, if any, that such other condition was aggravated by an injury resulting from the defective condition of the TVT-O. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any, for:

a. Physical pain and mental aguish sustained in the past.

Answer: $100,000.00

b. Physical pain and mental anguish that, in reasonable probability, Linda Batiste will sustain in the future.

Answer: $500,600.00

c. Physical impairment sustained in the past.

Answer: $0.00

d. Physical impairment that, in reasonable probability, Linda Batiste will sustain in the future.

Answer: $400,000.00

e. Reasonable expenses of necessary medical care that, in reasonable probability, Linda Batiste will incur in the future.

Answer: $200,000.00

**CHARGE OF THE COURT - Page 6**

*(Answer Question 4 only if you unanimously answered "Yes" to Question 1 or 2. Otherwise, do not answer Question 4.*

*To answer "Yes" to Question 4, your answer must be unanimous. You may answer "No" to Question 4 only upon a vote of 10 or more jurors. Otherwise, do not answer Question 4.)*

Before you consider the following questions relating to punitive damages, you are instructed as follows:

Punitive damages are awarded to punish Ethicon/Johnson & Johnson. Linda Batiste is not automatically entitled to punitive damages simply because you have found that Ethicon has defectively designed the TVT-O, or failed to provide adequate warnings regarding the TVT-O, or because you have awarded damages to compensate Linda Batiste for her injury. You may award punitive damages only under certain circumstances.

The purposes of punitive damages are different from the purposes of compensatory damages. Compensatory damages are intended to compensate Linda Batiste for the actual injury or loss she suffered due to use of Ethicon/Johnson & Johnson's product. In contrast, punitive damages are intended to punish a wrongdoer and to deter the wrongdoer from similar wrongful conduct in the future. Punitive damages are designed to require the wrongdoer to pay an amount of money sufficient to punish Ethicon/Johnson & Johnson for particular conduct and to deter Ethicon/Johnson & Johnson from future misconduct. Punitive damages are not to be awarded as a routine matter in every case; they are to be awarded only in exceptional cases, to punish a party who has acted in an especially egregious or outrageous matter and to discourage that party from engaging in similar misconduct in the future. Therefore, Linda Batiste is not entitled to punitive damages simply because you have found that Ethicon/Johnson & Johnson engaged in specific conduct or because you have awarded damages to compensate Linda Batiste for her injury. You may award punitive damages to Linda Batiste only if you find that she has proved certain additional matters.

To support an award of punitive damages here, you must find that Linda Batiste has proved, by clear and convincing evidence, that the injury, loss, or harm she suffered was the result of Ethicon/Johnson & Johnson's acts or omission and that either (1) Ethicon/Johnson & Johnson conduct was malicious, or (2) Ethicon/Johnson & Johnson acted in wanton and willful disregard of Linda Batiste's rights. Malicious conduct is intentional wrongdoing in the sense of an evil-minded act. Willful or wanton conduct is a deliberate act or omission with knowledge of a high degree of probability of harm to another who foreseeably might be harmed by that act or omission and reckless indifference to the consequence of the act or omission.

The standard of "clear and convincing evidence," mentioned above, means the evidence leaves no serious or substantial doubt about the correctness of the conclusions drawn from the evidence. This is different - and less - than proof beyond a reasonable doubt. This is also different - and more - than a preponderance of evidence to support an award of punitive damages.

In determining whether to award punitive damages, consider all relevant evidence, including but not limited to the following: (1) the likelihood, at the relevant time, that serious harm would

arise from Ethicon/Johnson & Johnson's conduct; (2) Ethicon/Johnson & Johnson's awareness or reckless disregard of the likelihood that such serious harm would arise from its conduct; (3) the conduct of Ethicon/Johnson & Johnson upon learning that its initial conduct would likely cause harm; and (4) the duration of the conduct or any concealment of that conduct by Ethicon/Johnson & Johnson.

If you decide that Ethicon/Johnson & Johnson has engaged in the type of wrongdoing that justifies punitive damages, you must decide the amount of punitive damages that should be awarded.

In doing so, you must consider all relevant evidence, including but not limited to, evidence of the four factors that I discussed in connection with your determination as to whether punitive damages should be awarded at all. These are: (1) the likelihood, at the relevant time, that serious harm would arise from Ethicon/Johnson & Johnson's conduct; (2) Ethicon/Johnson & Johnson's awareness or reckless disregard of the likelihood that such serious harm would arise from its conduct; (3) the conduct of Ethicon/Johnson & Johnson upon learning that its initial conduct would likely cause harm; and (4) the duration of the conduct or any concealment of that conduct by Ethicon/Johnson & Johnson.

Consider, also, the profitability, if any, of the misconduct to Ethicon/Johnson & Johnson; when the misconduct was terminated; and the financial condition of Ethicon/Johnson & Johnson or its ability to pay the punitive damages award. You must also make certain that there is a reasonable relationship between the actual injury and the punitive damages.

After considering all these factors, exercise your judgment and determine (1) whether punitive damages should be awarded in this case; and (2) if you decide to award punitive damages, what the proper amount should be.

## QUESTION 4

Did the harm to Linda Batiste result from Johnson & Johnson/Ethicon's (a) actual malice or (b) willful and wanton disregard of the rights of Linda Batiste?

Answer "Yes" or "No:"     _____

*(If you unanimously answered "Yes" to Question 4, answer Question 5. Otherwise, do not answer Question 5.)*

## QUESTION 5

What sum of money, if any, should be assessed against Johnson & Johnson/Ethicon and awarded to Linda Batiste as punitive damages for the conduct found in response to Question 4?

You are instructed that you must unanimously agree on the amount of any award of punitive damages.

Answer in dollars and cents, if any:     _____

**Presiding Juror:**

After you retire to the jury room to answer the questions I have put to you, the first thing you must do is choose a presiding juror.

It is the duty of the presiding juror –

1. to have this complete Charge read aloud, if it will be helpful to your deliberations,

2. to preside during your deliberations, meaning to manage the discussions, and see that you follow these instructions,

3. to write out and hand to the bailiff any communications concerning the case that you desire to have delivered to me,

4. to write down the answers you agree on,

5. to get the signatures for the verdict certificate, and

6. to notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror?


**Instructions for Signing the Verdict Certificate:**

1. Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the Charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2. If 10 jurors agree on every answer, those 10 jurors sign the verdict. If 11 jurors agree on every answer, those 11 jurors sign the verdict. If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

4. There are some special instructions before Questions 4 and 5 explaining how to answer those questions. Please follow the instructions. If all 12 of you

answer those questions, you will need to complete an additional verdict certificates for those questions.

Do you understand these instructions?

When you have answered all the questions you are required to answer under the instructions I have given you and your presiding juror has placed your answers in the spaces provided and signed the verdict as presiding juror or obtained the signatures, you will inform the bailiff that you have reached a verdict, and then you will return into Court with your verdict.

Signed this **2d** day of April, 2014.

KEN MOLBERG
**Judge, 95TH District Court**

## CERTIFICATE

Check one:

1. _____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____        _____
Signature of Presiding Juror            Printed Name of Presiding Juror

2. _____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

3. ___✓___ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

Jurors' Signatures                      Jurors' Printed Names

_____         Timothy WHITE
Elise Mitchell                          Elise Mitchell
_____         MATTHEW OLDEN
_____         Mariela Anderson.
___ Conaway ___                         Tiffany Conaway
Gary Ruska                              Gary Ruska
Laura Harman                            Laura Harman
_____         MICHAEL JAMNONGJIT
_____         CARLOVUS Joseph
_____         Timothy S. Hancock

*(If you have awarded an amount in answer to Question 5, then complete this Additional Certificate. Otherwise, do not complete it.)*

## ADDITIONAL CERTIFICATE

I certify than any "Yes" answer given by the Jury to Questions 1 or 2 was unanimous. I further certify that a "Yes" answer to Question 4 was unanimous. I further certify that any amount awarded by the Jury in answer to Question 5 was unanimous. The presiding juror has signed the certificate for all 12 of us.

_____          _____
Signature of Presiding Juror                      Printed Name of Presiding Juror

*Accepted & Received*
*5:52 p.m.*
*4/3/14*

*[signature]*
*Judge*

**TAB 5**

Vernon's Texas Statutes and Codes Annotated
  Civil Practice and Remedies Code (Refs & Annos)
    Title 4. Liability in Tort
      Chapter 82. Products Liability (Refs & Annos)

V.T.C.A., Civil Practice & Remedies Code § 82.005

§ 82.005. Design Defects

Currentness

(a) In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that:

(1) there was a safer alternative design; and

(2) the defect was a producing cause of the personal injury, property damage, or death for which the claimant seeks recovery.

(b) In this section, "safer alternative design" means a product design other than the one actually used that in reasonable probability:

(1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility; and

(2) was economically and technologically feasible at the time the product left the control of the manufacturer or seller by the application of existing or reasonably achievable scientific knowledge.

(c) This section does not supersede or modify any statute, regulation, or other law of this state or of the United States that relates to liability for, or to relief in the form of, abatement of nuisance, civil penalties, cleanup costs, cost recovery, an injunction, or restitution that arises from contamination or pollution of the environment.

(d) This section does not apply to:

(1) a cause of action based on a toxic or environmental tort as defined by Sections 33.013(c)(2) and (3); or

(2) a drug or device, as those terms are defined in the federal Food, Drug, and Cosmetic Act (21 U.S.C. Section 321).

(e) This section is not declarative, by implication or otherwise, of the common law with respect to any product and shall not be construed to restrict the courts of this state in developing the common law with respect to any product which is not subject to this section.

**Credits**

Added by Acts 1993, 73rd Leg., ch. 5, § 1, eff. Sept. 1, 1993.

V. T. C. A., Civil Practice & Remedies Code § 82.005, TX CIV PRAC & REM § 82.005
Current through the end of the 2015 Regular Session of the 84th Legislature

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**WestlawNext**© 2015 Thomson Reuters. No claim to original U.S. Government Works.    2

**TAB 6**

Restatement (Second) of Torts § 402A (1965)

Restatement of the Law - Torts

Database updated October 2015
Restatement (Second) of Torts

Division Two. Negligence

Chapter 14. Liability of Persons Supplying Chattels for the Use of Others

Topic 5. Strict Liability

§ 402A Special Liability of Seller of Product for Physical Harm to User or Consumer

<span style="color:blue">Comment:</span>

**(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if**

> **(a) the seller is engaged in the business of selling such a product, and**

> **(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.**

**(2) The rule stated in Subsection (1) applies although**

> **(a) the seller has exercised all possible care in the preparation and sale of his product, and**

> **(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.**

**See Reporter's Notes.**

**Caveat:**

The Institute expresses no opinion as to whether the rules stated in this Section may not apply

(1) to harm to persons other than users or consumers;

(2) to the seller of a product expected to be processed or otherwise substantially changed before it reaches the user or consumer; or

(3) to the seller of a component part of a product to be assembled.

**Comment:**

*a*. This Section states a special rule applicable to sellers of products. The rule is one of strict liability, making the seller subject to liability to the user or consumer even though he has exercised all possible care in the preparation and sale of the product. The

Section is inserted in the Chapter dealing with the negligence liability of suppliers of chattels, for convenience of reference and comparison with other Sections dealing with negligence. The rule stated here is not exclusive, and does not preclude liability based upon the alternative ground of negligence of the seller, where such negligence can be proved.

*b. History.* Since the early days of the common law those engaged in the business of selling food intended for human consumption have been held to a high degree of responsibility for their products. As long ago as 1266 there were enacted special criminal statutes imposing penalties upon victualers, vintners, brewers, butchers, cooks, and other persons who supplied "corrupt" food and drink. In the earlier part of this century this ancient attitude was reflected in a series of decisions in which the courts of a number of states sought to find some method of holding the seller of food liable to the ultimate consumer even though there was no showing of negligence on the part of the seller. These decisions represented a departure from, and an exception to, the general rule that a supplier of chattels was not liable to third persons in the absence of negligence or privity of contract. In the beginning, these decisions displayed considerable ingenuity in evolving more or less fictitious theories of liability to fit the case. The various devices included an agency of the intermediate dealer or another to purchase for the consumer, or to sell for the seller; a theoretical assignment of the seller's warranty to the intermediate dealer; a third party beneficiary contract; and an implied representation that the food was fit for consumption because it was placed on the market, as well as numerous others. In later years the courts have become more or less agreed upon the theory of a "warranty" from the seller to the consumer, either "running with the goods" by analogy to a covenant running with the land, or made directly to the consumer. Other decisions have indicated that the basis is merely one of strict liability in tort, which is not dependent upon either contract or negligence.

Recent decisions, since 1950, have extended this special rule of strict liability beyond the seller of food for human consumption. The first extension was into the closely analogous cases of other products intended for intimate bodily use, where, for example, as in the case of cosmetics, the application to the body of the consumer is external rather than internal. Beginning in 1958 with a Michigan case involving cinder building blocks, a number of recent decisions have discarded any limitation to intimate association with the body, and have extended the rule of strict liability to cover the sale of any product which, if it should prove to be defective, may be expected to cause physical harm to the consumer or his property.

*c.* On whatever theory, the justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in the case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

*d.* The rule stated in this Section is not limited to the sale of food for human consumption, or other products for intimate bodily use, although it will obviously include them. It extends to any product sold in the condition, or substantially the same condition, in which it is expected to reach the ultimate user or consumer. Thus the rule stated applies to an automobile, a tire, an airplane, a grinding wheel, a water heater, a gas stove, a power tool, a riveting machine, a chair, and an insecticide. It applies also to products which, if they are defective, may be expected to and do cause only "physical harm" in the form of damage to the user's land or chattels, as in the case of animal food or a herbicide.

*e.* Normally the rule stated in this Section will be applied to articles which already have undergone some processing before sale, since there is today little in the way of consumer products which will reach the consumer without such processing. The rule is not, however, so limited, and the supplier of poisonous mushrooms which are neither cooked, canned, packaged, nor otherwise treated is subject to the liability here stated.

*f. Business of selling.* The rule stated in this Section applies to any person engaged in the business of selling products for use or consumption. It therefore applies to any manufacturer of such a product, to any wholesale or retail dealer or distributor, and to the operator of a restaurant. It is not necessary that the seller be engaged solely in the business of selling such products.

Thus the rule applies to the owner of a motion picture theatre who sells popcorn or ice cream, either for consumption on the premises or in packages to be taken home.

The rule does not, however, apply to the occasional seller of food or other such products who is not engaged in that activity as a part of his business. Thus it does not apply to the housewife who, on one occasion, sells to her neighbor a jar of jam or a pound of sugar. Nor does it apply to the owner of an automobile who, on one occasion, sells it to his neighbor, or even sells it to a dealer in used cars, and this even though he is fully aware that the dealer plans to resell it. The basis for the rule is the ancient one of the special responsibility for the safety of the public undertaken by one who enters into the business of supplying human beings with products which may endanger the safety of their persons and property, and the forced reliance upon that undertaking on the part of those who purchase such goods. This basis is lacking in the case of the ordinary individual who makes the isolated sale, and he is not liable to a third person, or even to his buyer, in the absence of his negligence. An analogy may be found in the provision of the Uniform Sales Act, § 15, which limits the implied warranty of merchantable quality to sellers who deal in such goods; and in the similar limitation of the Uniform Commercial Code, § 2-314, to a seller who is a merchant. This Section is also not intended to apply to sales of the stock of merchants out of the usual course of business, such as execution sales, bankruptcy sales, bulk sales, and the like.

*g*. *Defective condition*. The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him. The seller is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed. The burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained.

Safe condition at the time of delivery by the seller will, however, include proper packaging, necessary sterilization, and other precautions required to permit the product to remain safe for a normal length of time when handled in a normal manner.

*h*. A product is not in a defective condition when it is safe for normal handling and consumption. If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate warning of the danger (see Comment *j*), and a product sold without such warning is in a defective condition.

The defective condition may arise not only from harmful ingredients, not characteristic of the product itself either as to presence or quantity, but also from foreign objects contained in the product, from decay or deterioration before sale, or from the way in which the product is prepared or packed. No reason is apparent for distinguishing between the product itself and the container in which it is supplied; and the two are purchased by the user or consumer as an integrated whole. Where the container is itself dangerous, the product is sold in a defective condition. Thus a carbonated beverage in a bottle which is so weak, or cracked, or jagged at the edges, or bottled under such excessive pressure that it may explode or otherwise cause harm to the person who handles it, is in a defective and dangerous condition. The container cannot logically be separated from the contents when the two are sold as a unit, and the liability stated in this Section arises not only when the consumer drinks the beverage and is poisoned by it, but also when he is injured by the bottle while he is handling it preparatory to consumption.

*i*. *Unreasonably dangerous*. The rule stated in this Section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. Ordinary sugar is a deadly poison to diabetics, and castor oil found use under Mussolini as an instrument of torture. That is not what is meant by "unreasonably dangerous" in this Section. The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its

characteristics. Good whiskey is not unreasonably dangerous merely because it will make some people drunk, and is especially dangerous to alcoholics; but bad whiskey, containing a dangerous amount of fuel oil, is unreasonably dangerous. Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

*j. Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.

Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

*l. User or consumer.* In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.

"Consumers" include not only those who in fact consume the product, but also those who prepare it for consumption; and the housewife who contracts tularemia while cooking rabbits for her husband is included within the rule stated in this Section, as is also the husband who is opening a bottle of beer for his wife to drink. Consumption includes all ultimate uses for which the product is intended, and the customer in a beauty shop to whose hair a permanent wave solution is applied by the shop

is a consumer. "User" includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.

**Illustration:**

> 1. A manufactures and packs a can of beans, which he sells to B, a wholesaler. B sells the beans to C, a jobber, who resells it to D, a retail grocer. E buys the can of beans from D, and gives it to F. F serves the beans at lunch to G, his guest. While eating the beans, G breaks a tooth, on a pebble of the size, shape, and color of a bean, which no reasonable inspection could possibly have discovered. There is satisfactory evidence that the pebble was in the can of beans when it was opened. Although there is no negligence on the part of A, B, C, or D, each of them is subject to liability to G. On the other hand E and F, who have not sold the beans, are not liable to G in the absence of some negligence on their part.

*m. "Warranty."* The liability stated in this Section does not rest upon negligence. It is strict liability, similar in its nature to that covered by Chapters 20 and 21. The basis of liability is purely one of tort.

A number of courts, seeking a theoretical basis for the liability, have resorted to a "warranty," either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. In some instances this theory has proved to be an unfortunate one. Although warranty was in its origin a matter of tort liability, and it is generally agreed that a tort action will still lie for its breach, it has become so identified in practice with a contract of sale between the plaintiff and the defendant that the warranty theory has become something of an obstacle to the recognition of the strict liability where there is no such contract. There is nothing in this Section which would prevent any court from treating the rule stated as a matter of "warranty" to the user or consumer. But if this is done, it should be recognized and understood that the "warranty" is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.

The rule stated in this Section does not require any reliance on the part of the consumer upon the reputation, skill, or judgment of the seller who is to be held liable, nor any representation or undertaking on the part of that seller. The seller is strictly liable although, as is frequently the case, the consumer does not even know who he is at the time of consumption. The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to "buyer" and "seller" in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. The consumer's cause of action does not depend upon the validity of his contract with the person from whom he acquires the product, and it is not affected by any disclaimer or other agreement, whether it be between the seller and his immediate buyer, or attached to and accompanying the product into the consumer's hands. In short, "warranty" must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort.

*n. Contributory negligence.* Since the liability with which this Section deals is not based upon negligence of the seller, but is strict liability, the rule applied to strict liability cases (see § 524) applies. Contributory negligence of the plaintiff is not a defense when such negligence consists merely in a failure to discover the defect in the product, or to guard against the possibility of its existence. On the other hand the form of contributory negligence which consists in voluntarily and unreasonably proceeding to encounter a known danger, and commonly passes under the name of assumption of risk, is a defense under this Section as in other cases of strict liability. If the user or consumer discovers the defect and is aware of the danger, and nevertheless proceeds unreasonably to make use of the product and is injured by it, he is barred from recovery.

**Comment on Caveat:**

*o. Injuries to non-users and non-consumers.* Thus far the courts, in applying the rule stated in this Section, have not gone beyond allowing recovery to users and consumers, as those terms are defined in Comment *l.* Casual bystanders, and others who may come in contact with the product, as in the case of employees of the retailer, or a passer-by injured by an exploding bottle, or a pedestrian hit by an automobile, have been denied recovery. There may be no essential reason why such plaintiffs should not be brought within the scope of the protection afforded, other than that they do not have the same reasons for expecting such protection as the consumer who buys a marketed product; but the social pressure which has been largely responsible for the development of the rule stated has been a consumers' pressure, and there is not the same demand for the protection of casual strangers. The Institute expresses neither approval nor disapproval of expansion of the rule to permit recovery by such persons.

*p. Further processing or substantial change.* Thus far the decisions applying the rule stated have not gone beyond products which are sold in the condition, or in substantially the same condition, in which they are expected to reach the hands of the ultimate user or consumer. In the absence of decisions providing a clue to the rules which are likely to develop, the Institute has refrained from taking any position as to the possible liability of the seller where the product is expected to, and does, undergo further processing or other substantial change after it leaves his hands and before it reaches those of the ultimate user or consumer.

It seems reasonably clear that the mere fact that the product is to undergo processing, or other substantial change, will not in all cases relieve the seller of liability under the rule stated in this Section. If, for example, raw coffee beans are sold to a buyer who roasts and packs them for sale to the ultimate consumer, it cannot be supposed that the seller will be relieved of all liability when the raw beans are contaminated with arsenic, or some other poison. Likewise the seller of an automobile with a defective steering gear which breaks and injures the driver, can scarcely expect to be relieved of the responsibility by reason of the fact that the car is sold to a dealer who is expected to "service" it, adjust the brakes, mount and inflate the tires, and the like, before it is ready for use. On the other hand, the manufacturer of pig iron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer. The question is essentially one of whether the responsibility for discovery and prevention of the dangerous defect is shifted to the intermediate party who is to make the changes. No doubt there will be some situations, and some defects, as to which the responsibility will be shifted, and others in which it will not. The existing decisions as yet throw no light upon the questions, and the Institute therefore expresses neither approval nor disapproval of the seller's strict liability in such a case.

*q. Component parts.* The same problem arises in cases of the sale of a component part of a product to be assembled by another, as for example a tire to be placed on a new automobile, a brake cylinder for the same purpose, or an instrument for the panel of an airplane. Again the question arises, whether the responsibility is not shifted to the assembler. It is no doubt to be expected that where there is no change in the component part itself, but it is merely incorporated into something larger, the strict liability will be found to carry through to the ultimate user or consumer. But in the absence of a sufficient number of decisions on the matter to justify a conclusion, the Institute expresses no opinion on the matter.

---

**Reporter's Notes**

This Section has been added to the first Restatement.

*1.* The Section is supported, as to food and drink, by decisions in the following jurisdictions:

*Arizona.* Crystal Coca-Cola Bottling Co. v. Cathey, 83 Ariz. 163, 317 P.2d 1094 (1957); see Eisenbeiss v. Payne, 42 Ariz. 262, 25 P.2d 162 (1933).

*California.* Klein v. Duchess Sandwich Co., 14 Cal.2d 272, 93 P.2d 799 (1939); Vaccarezza v. Sanguinetti, 71 Cal.App.2d 687, 163 P.2d 470 (1945); Medeiros v. Coca-Cola Bottling Co., 57 Cal.App.2d 707, 135 P.2d 676 (1943).

*Florida.* Blanton v. Cudahy Packing Co., 154 Fla. 872, 19 So.2d 313 (1944); Florida Coca-Cola Bottling Co. v. Jordan, 62 So.2d 910 (Fla.1953); Canada Dry Bottling Co. of Florida v. Shaw, 118 So.2d 840 (Fla.App.1960).

*Illinois.* Patargias v. Coca-Cola Bottling Co., 332 Ill.App. 117, 74 N.E.2d 162 (1947); Blarjeske v. Thompson's Restaurant Co., 325 Ill.App. 189, 55 N.E.2d 320 (1945); Welter v. Bowman Dairy Co., 318 Ill.App. 305, 47 N.E.2d 739 (1943); Heimsoth v. Falstaff Brewing Corp., 1 Ill.App.2d 28, 116 N.E.2d 193 (1953).

*Iowa.* Davis v. Van Camp Packing Co., 189 Iowa 775, 176 N.W. 382, 17 A.L.R. 649 (1920); Anderson v. Tyler, 223 Iowa 1033, 274 N.W. 48 (1937).

*Kansas.* Parks v. C. C. Yost Pie Co., 93 Kan. 334, 144 P. 202, L.R.A. 1915C, 179, 7 N.C.C.A. 100 (1914); Challis v. Hartloff, 136 Kan. 823, 18 P.2d 199 (1933); Swengel v. F. & E. Wholesale Grocery Co., 147 Kan. 555, 77 P.2d 930, 4 N.C.C.A. N.S. 709 (1938); Nichols v. Nold, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887 (1953); Simmons v. Wichita Coca-Cola Bottling Co., 181 Kan. 35, 309 P.2d 633 (1957); Cernes v. Pittsburg Coca-Cola Bottling Co., 183 Kan. 758, 332 P.2d 258, 77 A.L.R.2d 208 (1958); Rupp v. Norton Coca-Cola Bottling Co., 187 Kan. 390, 357 P.2d 802 (1960); Connell v. Norton Coca-Cola Bottling Co., 187 Kan. 393, 357 P.2d 804 (1960).

*Louisiana.* Le Blanc v. Louisiana Coca-Cola Bottling Co., 221 La. 919, 60 So.2d 873 (1952); Miller v. Louisiana Coca-Cola Bottling Co., 70 So.2d 409 (La.App.1954).

*Michigan.* Manzoni v. Detroit Coca-Cola Bottling Co., 363 Mich. 235, 109 N.W.2d 918 (1961).

*Mississippi.* Jackson Coca-Cola Bottling Co. v. Chapman, 106 Miss. 864, 64 So. 791 (1914); Rainwater v. Hattiesburg Coca-Cola Bottling Co., 131 Miss. 315, 95 So. 444 (1923); Coca-Cola Bottling Works v. Lyons, 145 Miss. 876, 111 So. 305 (1927); Chenault v. Houston Coca-Cola Bottling Co., 151 Miss. 366, 118 So. 177 (1928); Coca-Cola Bottling Works v. Simpson, 158 Miss. 390, 130 So. 479, 72 A.L.R. 143 (1930); Bufkin v. Grisham, 157 Miss. 746, 128 So. 563 (1930); Curtiss Candy Co. v. Johnson, 163 Miss. 426, 141 So. 762 (1932); Biedenharn Candy Co. v. Moore, 184 Miss. 721, 186 So. 628 (1939).

*Missouri.* Madouros v. Kansas City Coca-Cola Bottling Co., 230 Mo.App. 275, 90 S.W.2d 445 (1936); Nemela v. Coca-Cola Bottling Co., 104 S.W.2d 773 (Mo.App.1937); McNicholas v. Continental Baking Co., 112 S.W.2d 849 (Mo.App.1938); Carter v. St. Louis Dairy Co., 139 S.W.2d 1025 (Mo.App.1940); Helms v. General Baking Co., 164 S.W.2d 150 (Mo.App.1942); Foley v. Coca-Cola Bottling Co., 215 S.W.2d 314 (Mo.App.1948).

*Nebraska.* Asher v. Coca-Cola Bottling Co., 172 Neb. 855, 112 N.W.2d 252 (1961).

*New Jersey.* There are as yet no food cases, but in Henningsen v. Bloomfield Motors, 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960), where strict liability was applied to an automobile, the food rule apparently was approved.

*New York.* This state has gone beyond food, in Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 191 N.E.2d 81 (1963).

*Ohio.* Ward Baking Co. v. Trizzino, 27 Ohio App. 475, 161 N.E. 557 (1928); Tennebaum v. Pendergast, 55 Ohio L. Abs. 235, 90 N.E.2d 453 (C.P.1949); Mahoney v. Shaker Square Beverages, 46 Ohio Op. 250, 64 Ohio L.Abs. 200, 102 N.E.2d 281 (Com.Pl.1951).

*Pennsylvania.* At first this state relied on a pure food statute, said to be declaratory of the common law. Catani v. Swift & Co., 251 Pa. 52, 95 A. 931, L.R.A. 1917B, 1272 (1915), error dismissed, 241 U.S. 690, 36 S.Ct. 554, 60 L.Ed. 1238; Nock v. Coca-

Cola Bottling Works, 102 Pa.Super. 515, 156 A. 537 (1931). Later cases have ceased to mention it. Bilk v. Abbott's Dairies, 147 Pa.Super. 39, 23 A.2d 342 (1941); Caskie v. Coca-Cola Bottling Co., 373 Pa. 614, 96 A.2d 901 (1953); see Bonker v. Ingersoll Products Co., 132 F.Supp. 5 (D.Mass.1955).

*Puerto Rico.* Coca-Cola Bottling Co. v. Negron Torres, 255 F.2d 149 (1 Cir.1958); Ponce De Leon v. Coca-Cola Bottling Co., 75 F.Supp. 966 (D. Puerto Rico 1948).

*Tennessee.* Probably. General Motors Corp. v. Dodson, 47 Tenn.App. 438, 338 S.W.2d 655 (1960), imposed strict liability as to an automobile, which appears to indicate a change in the law.

*Texas.* Jacob E. Decker & Sons v. Capps, 139 Tex. 609, 164 S.W.2d 828, 142 A.L.R. 1479 (1942); Griggs Canning Co. v. Josey, 139 Tex. 623, 164 S.W.2d 835, 142 A.L.R. 1424 (1942), answer conformed to, 165 S.W.2d 203 (Tex.Civ.App.); Coca-Cola Bottling Co. v. Smith, 97 S.W.2d 761 (Tex.Civ.App.1936); Coca-Cola Bottling Co. v. Burgess, 195 S.W.2d 379 (Tex.Civ.App.1946), refused no reversible error; Amarillo Coca-Cola Bottling Co. v. Loudder, 207 S.W.2d 632 (Tex.Civ.App.1947); Sweeney v. Cain, 243 S.W.2d 874 (Tex.Civ.App.1951); Campbell Soup Co. v. Ryan, 328 S.W.2d 821 (Tex.Civ.App.1959).

*Virginia.* Swift & Co. v. Wells, 201 Va. 213, 110 S.E.2d 203 (1959).

*Washington.* Nelson v. West Coast Dairy Co., 5 Wash.2d 284, 105 P.2d 76, 130 A.L.R. 606 (1940); La Hue v. Coca-Cola Bottling, Inc., 50 Wash.2d 645, 314 P.2d 421 (1957); see Geisness v. Scow Bay Packing Co., 16 Wash.2d 1, 132 P.2d 740 (1942); Mazetti v. Armour & Co., 75 Wash. 622, 135 P. 633, 48 L.R.A. N.S. 213, Ann.Cas. 1915C, 140 (1913).

*2.* The following states now reach the same result, as to food and drink, under statutes which provide for strict liability, or are construed to have that effect:

*Connecticut.* Conn. Gen. Stat. § 2161c (Supp.1953). A food warranty to "all persons for whom such food and drink is intended."

*Georgia.* Donaldson v. Great A. & P. Tea Co., 186 Ga. 870, 199 S.E. 213, 128 A.L.R. 456 (1938), answer conformed to, 59 Ga.App. 79, 200 S.E. 498.

*Minnesota.* Meshbesher v. Channellene Oil & Mfg. Co., 107 Minn. 104, 119 N.W. 428, 131 Am.St.Rep. 441 (1909).

*Montana.* Bolitho v. Safeway Stores, 109 Mont. 213, 95 P.2d 443 (1939).

*South Carolina.* Culbertson v. Coca-Cola Bottling Co., 157 S.C. 352, 154 S.E. 424 (1930); Hollis v. Armour & Co., 190 S.C. 170, 2 S.E.2d 681 (1939); McKenzie v. Peoples Baking Co., 205 S.C. 149, 31 S.E.2d 154 (1944).

*3.* The products to which liability has been extended, beyond those for "intimate bodily use," are as follows:

*Animal food:* McAfee v. Cargill, Inc., 121 F.Supp. 5 (S.D.Cal.1954), dog food; Midwest Game Co. v. M.F.A. Milling Co., 320 S.W.2d 547 (Mo.1959), fish food.

*Automobiles:* Jarnot v. Ford Motor Co., 191 Pa.Super. 422, 156 A.2d 559 (1959), truck; Henningsen v. Bloomfield Motors, 32 N.J. 158, 161 A.2d 69 (1960); Pabon v. Hackensack Auto Sales, Inc., 63 N.J.Super. 476, 164 A.2d 773 (1960); Courtois v. General Motors Corp., 37 N.J. 525, 182 A.2d 545 (1962); General Motors Corp. v. Dodson, 338 S.W.2d 655 (Tenn.App.1960); State Farm Mut. Automobile Ins. Co. v. Anderson-Weber, Inc., 110 N.W.2d 449 (Iowa 1961); Thompson v. Reedman, 199 F.Supp. 120 (E.D.Pa.1961); Picker X-Ray Corp. v. General Motors Corp., 185 A.2d 919 (Mun.App.D.C.1962); Duckworth v.

Ford Motor Co., 211 F.Supp. 888 (E.D.Pa.1962); Connolly v. Hagi, 24 Conn. Super. 198, 188 A.2d 884 (1963); Vandermark v. Ford Motor Co., 33 Cal.Rptr. 175 (Cal.App.1963).

*Tires:* B.F. Goodrich Co. v. Hammond, 269 F.2d 501 (10 Cir.1959). Cf. Hart v. Goodyear Tire & Rubber Co., 214 F.Supp. 817 (N.D.Ind.1963), extension of "privity" to purchaser's employee.

*Steering gear:* Magee v. General Motors, 124 F.Supp. 606 (W.D.Pa.1954).

*Airplanes:* Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 191 N.E.2d 81 (1963); Middleton v. United Aircraft Corp., 204 F.Supp. 856 (S.D.N.Y.1960); Hinton v. Republic Aviation Corp., 180 F.Supp. 31 (S.D.N.Y.1959), California law; Siegel v. Braniff Airways, 204 F.Supp. 865 (S.D.N.Y.1960), Michigan law; Ewing v. Lockheed Aircraft Corp., 202 F.Supp. 216 (D.Minn.1962), Texas law; King v. Douglas Aircraft Co., 159 So.2d 108 (Fla.App.1963).

*Airplane instrument:* Taylerson v. American Airlines, 183 F.Supp. 882 (S.D.N.Y.) 1960).

*Grinding wheels:* Di Vello v. Gardner Machine Co., 46 Ohio Op. 161, 102 N.E.2d 285 (1951), possibly overruled, possibly not; Peterson v. Lamb Rubber Co., 54 Cal.2d 339, 353 P.2d 575 (1959); Jabukowski v. Minnesota Mining & Mfg. Co., 193 A.2d 275 (N.J.Super.1963).

*Cinder building blocks:* Spence v. Three Rivers Builders & Masonry Supply, Inc., 353 Mich. 120, 90 N.W.2d 873 (1958).

*Electric cable:* Continental Copper & Steel Industries v. E.C. "Red" Cornelius, Inc., 102 So.2d 40 (Fla.App.1958).

*Insecticide spray:* McQuaide v. Bridgeport Brass Co., 190 F.Supp. 252 (D.Conn.1960).

*Herbicide:* See Spada v. Stauffer Chemical Co., 195 F.Supp. 819 (D. Or.1961).

*Combination power tool:* Greenman v. Yuba Power Products, Inc., 377 P.2d 899 (Cal.1963).

*Power golf cart:* Simpson v. Powered Products of Michigan, Inc., 24 Conn.Super. 409, 192 A.2d 555 (1963).

*Children's playground equipment:* McBurnette v. Playground Equipment Corp., 137 So.2d 563 (Fla.1962).

*Chair:* Thomas v. Leary, 15 App.Div.2d 438, 225 N.Y.S.2d 137 (1962).

*Riveting machine:* Hoffman v. Cox, 35 Misc.2d 103, 229 N.Y.S.2d 485 (1962).

*Water heater:* Deveny v. Rheem Mfg. Co., 319 F.2d 124 (2 Cir.1963), Vermont law.

*Gas stove:* Morrow v. Caloric Appliances Corp., 372 S.W.2d 41 (Mo.1963).

*All products:* See the sweeping dictum in Beck v. Spindler, 256 Minn. 543, 99 N.W.2d 670 (1959).

Statutes applicable to all products: Ga. Code Ann. § 96-307; Va. Code Ann., 1960 Supp., § 8-654.3; Wyo. Stats., 1961 Cum. Supp., § 40A-318.

*4.* The following jurisdictions still reject the rule stated in this Section, even as to food:

*Alabama.* Birmingham Chero-Cola Bottling Co. v. Clark, 205 Ala. 678, 89 So. 64, 17 A.L.R. 667 (1921); Sterchi Bros. Stores v. Castleberry, 28 Ala.App. 281, 182 So. 471 (1937). Cases in the intermediate courts have accepted the strict liability, but apparently are not the present law. Dothan Chero-Cola Bottling Co. v. Weeks, 16 Ala.App. 639, 80 So. 734 (1918), disapproved, Birmingham Chero-Cola Bottling Co. v. Clark, 205 Ala. 678, 89 So. 64, 17 A.L.R. 667 (1921); Alabama Chero-Cola Bottling Co. v. Ezzell, 22 Ala.App. 210, 114 So. 278 (1927).

*Arkansas.* Drury v. Armour & Co., 140 Ark. 371, 216 S.W. 40 (1919); Nelson v. Armour Packing Co., 76 Ark. 352, 90 S.W. 288, 6 Ann.Cas. 237 (1905); Great A. & P. Tea Co. v. Gwilliams, 189 Ark. 1037, 76 S.W.2d 65 (1934).

*Kentucky.* Nehi Bottling Co. v. Thomas, 236 Ky. 684, 33 S.W.2d 701 (1930).

*Maine.* Pelletier v. Dupont, 124 Me. 269, 128 A. 186, 39 A.L.R. 972 (1925).

*Massachusetts.* Gearing v. Berkson, 223 Mass. 257, 111 N.E. 785, L.R.A.1916D, 1006 (1916); Newhall v. Ward Baking Co., 240 Mass. 434, 134 N.E. 625 (1922); Carlson v. Turner Centre System, 263 Mass. 339, 161 N.E. 245 (1928); Kennedy v. Brockelman Bros. 334 Mass. 225, 134 N.E.2d 747 (1956); Karger v. Armour & Co., 17 F.Supp. 484 (D.Mass.1936).

*New Hampshire.* Howson v. Foster Beef Co., 87 N.H. 200, 177 A. 656 (1935); Hazelton v. First National Stores, 88 N.H. 409, 190 A. 280 (1937); Smith v. Salem Coca-Cola Bottling Co., 92 N.H. 97, 25 A.2d 125 (1942); Russell v. First National Stores, 96 N.H. 471, 79 A.2d 573 (1951).

*North Carolina.* Thomason v. Ballard & Ballard Co., 208 N.C. 1, 179 S.E. 30 (1935); Enloe v. Charlotte Coca-Cola Bottling Co., 208 N.C. 305, 180 S.E. 582 (1935); Caudle v. F.M. Bohannon Tobacco Co., 220 N.C. 105, 16 S.E.2d 680 (1941). See Prince v. Smith, 254 N.C. 768, 119 S.E.2d 923 (1961).

*Rhode Island.* Minutilla v. Providence Ice Cream Co., 50 R.I. 43, 144 A. 884, 63 A.L.R. 334 (1929); Lombardi v. California Packing Sales Corp., 83 R.I. 51, 112 A.2d 701 (1955).

*South Dakota.* Whitethorn v. Nash-Finch Co., 67 S.D. 465, 293 N.W. 859 (1940).

*West Virginia.* Burgess v. Sanitary Meat Market, 121 W.Va. 605, 5 S.E.2d 785 (1939).

*Wisconsin.* Prinsen v. Russos, 194 Wis. 142, 215 N.W. 905 (1927); Cohan v. Associated Fur Farms, 261 Wis. 584, 53 N.W.2d 788 (1952).

*5.* The rule stated is supported, as to other products for intimate bodily use, by the following cases:

*Hair dye:* Graham v. Bottenfield's, Inc., 176 Kan. 68, 269 P.2d 413 (1954).

*Soap:* Krupar v. Proctor & Gamble Co., 113 N.E.2d 605 (Ohio App.1953), reversed on other grounds, 160 Ohio St. 489, 52 Ohio Op. 363, 117 N.E.2d 7 (1954).

*Detergent*, coming in contact with hands: Worley v. Proctor & Gamble Mfg. Co., 241 Mo.App. 1114, 253 S.W.2d 532 (1952), express warranty also found; Hamon v. Digliani, 148 Conn. 710, 174 A.2d 294 (1961), same.

*Permanent wave solution:* Markovich v. McKesson & Robbins, Inc., 106 Ohio App. 265, 7 Ohio Op.2d 10, 78 Ohio L.Abs. 111, 149 N.E.2d 181 (1958); Rogers v. Toni Home Permanent Co., 167 Ohio St. 244, 4 Ohio Op.2d 291, 147 N.E.2d 612, 75 A.L.R.2d 103 (1958); Patterson v. George H. Weyer, Inc., 189 Kan. 501, 370 P.2d 116 (1962).

*Clothing:* Chapman v. Brown, 198 F.Supp. 78 (D. Hawaii 1961), affirmed, 304 F.2d 149 (C.A.9), hula skirt.

*Cigarettes:* Ross v. Philip Morris Co., (E.D.Mo. Oct. 22, 1959, No. 9494), modifying the opinion in 164 F.Supp. 683 (W.D.Mo.1958); Pritchard v. Liggett & Myers Tobacco Co. 295 F.2d 292, 22 N.C.C.A.3d 421 (3 Cir.1961).

*Surgical pin for setting bone fractures:* Bowles v. Zimmer Mfg. Co., 277 F.2d 868, 76 A.L.R.2d 120 (7 Cir.1960), Michigan law.

*Poliomyelitis vaccine:* Gottsdanker v. Cutter Laboratories, 182 Cal.App.2d 602, 6 Cal.Rptr. 320, 79 A.L.R.2d 290 (1960).

*Comment f.* All of the foregoing cases imposing strict liability have involved defendants engaged in the business of selling the particular products. Most of the courts have applied the rule to retail sellers as well as manufacturers. Mississippi and Missouri apparently will refuse to apply it to retailers. See Kroger Grocery Co. v. Lewelling, 165 Miss. 71, 145 So. 726 (1933); Elmore v. Grenada Grocery Co., 189 Miss. 370, 197 So. 761 (1940); Conner v. Great A. & P. Tea Co., 25 F.Supp. 855 (W.D.Mo.1939); McIntyre v. Kansas City Coca-Cola Bottling Co., 85 F.Supp. 708 (W.D.Mo.1949), appeal dismissed, 184 F.2d 671 (C.A.8).

The wholesaler's strict liability was rejected in Elmore v. Grenada Grocery Co., 189 Miss. 370, 197 So. 761 (1940); De Gouveia v. H. D. Lee Merc. Co., 231 Mo.App. 447, 100 S.W.2d 336 (1936); and Bowman Biscuit Co. v. Hines, 151 Tex. 370, 251 S.W.2d 153 (1952). It was applied in Swengel v. F. & E. Wholesale Grocery Co., 147 Kan. 555, 77 P.2d 930, 4 N.C.C.A.N.S. 709 (1938); Nichols v. Nold, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887 (1953); Graham v. Bottenfield's, Inc., 176 Kan. 68, 269 P.2d 413 (1954); Nelson v. West Coast Dairy Co., 5 Wash.2d 284, 105 P.2d 76, 130 A.L.R. 606 (1940), and approved in dicta in Hoskins v. Jackson Grain Co., 63 So.2d 514 (Fla.1953), and Davis v. Radford, 233 N.C. 283, 63 S.E.2d 822, 24 A.L.R.2d 906 (1951).

*Comment h.* The strict liability was applied to containers in Canada Dry Bottling Co. v. Shaw 118 So.2d 840 (Fla.App.1960); Nichols v. Nold, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887 (1953); Johnson v. Louisiana Coca-Cola Bottling Co., 63 So.2d 459, 463 (La.App.1953); Mahoney v. Shaker Square Beverages, Inc., 46 Ohio Op. 250, 64 Ohio L.Abs. 200, 102 N.E.2d 281 (C.P.1951); Vallis v. Canada Dry Ginger Ale, Inc. 190 Cal.App.2d 35, 11 Cal.Rptr. 823 (1961); Jones v. Burgermeister Brewing Corp., 198 Cal.App.2d 198, 18 Cal.Rptr. 311 (1961).

Contra are Soter v. Griesedieck Western Brewery Co., 200 Okla. 302, 193 P.2d 575, 4 A.L.R.2d 458 (1948); McAlester Coca-Cola Bottling Co., v. Lynch, 280 P.2d 466 (Okla.1955); Anheuser-Busch, Inc. v. Butler, 180 S.W.2d 996 (Tex.Civ.App.1944); Latham v. Coca-Cola Bottling Co., 175 S.W.2d 426 (Tex.Civ.App.1943).

*Comment k:*Recovery was allowed to a customer in a beauty shop whose hair was treated with defendant's product, in Graham v. Bottenfield's, Inc., 176 Kan. 68, 269 P.2d 413 (1954); Patterson v. George H. Weyer, Inc., 189 Kan. 501, 370 P.2d 116 (1962), and to a housewife who contracted tularemia in cooking rabbits purchased by her husband, in Haut v. Kleene, 320 Ill.App. 273, 50 N.E.2d 855 (1943). See also Thompson v. Reedman, 199 F.Supp. 120 (E.D.Pa.1961), riding in automobile; Hinton v. Republic Aviation Corp., 180 F.Supp. 31 (S.D.N.Y.1959), passenger in airplane; Midleton v. United Aircraft Corp., 204 F.Supp. 856 (S.D.N.Y.1960), same; Ewing v. Lockheed Aircraft Corp., 202 F.Supp. 216 (D.Min.1962); Goldberg v. Kollsman Instrument Corp., 12 N.Y.2d 432, 191 N.E.2d 81 (1963); Siegel v. Braniff Airways, 204 F.Supp 861 (S.D.N.Y.1960).

Members of the family of the final purchaser, consuming the product, recovered in Jacob E. Decker & Sons, Inc. v. Capps, 139 Tex. 609, 164 S.W.2d 835, 142 A.L.R. 1424 (1942), answer conformed to, 165 S.W.2d 203 (Tex.Civ.App); Swengel v. F. & E. Wholesale Grocery Co., 147 Kan 555, 77 P.2d 930, 4 N.C.C.A.N.S. 709 (1938); Nichols v. Nold, 174 Kan. 613, 258 P.2d 317, 38 A.L.R.2d 887 (1953); Swift & Co. v. Wells, 201 Va. 213, 110 S.E.2d 203 (1959); Blanton v. Cudahy Packing Co., 154 Fla. 872, 19 So.2d 313 91944); Welter v. Bowman Dairy Co., 318 Ill.App. 305, 47 N.E.2d 739 (1943); Davis v. Van Camp Packing Co., 189 Iowa 775, 176 N.W. 382, 17 A.L.R. 649 (1920); Greenberg v. Lorenz, 9 N.Y.2d 195, 213 N.Y.S.2d 39, 173 N.E.2d 773 (1961); Gottsdanker v. Cutter Laboratories, 182 Cal.App.2d 602, 6 Cal.Rptr. 320, 79 A.L.R.2d 290 (1960).

See also Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69, 75 A.L.R.2d 1 (1960), wife driving automobile; Thompson v. Reedman, 199 F.Supp. 120 (E.D.Pa.1961), wife riding in automobile.

Employees of the final purchaser recovered in Mahoney v. Shaker Square Beverages, Inc., 46 Ohio Op. 250, 64 Ohio L.Abs. 200, 102 N.E.2d 281 (Com.Pl.1951); Vallis v. Canada Dry Ginger Ale, Inc., 190 Cal.App.2d 35, 11 Cal.Rptr. 823 (1961); Jones v Burgermeister Brewing Corp., 198 Cal.App.2d 198, 18 Cal.Rptr. 311 (1961); Simpson v. Eichenbrunner, 31 Misc.2d 958, 217 N.Y.S.2d 678 (1961); Jabukowski v. Minnesota Mining & Mfg. Co., 80 N.J.Super. 184, 193 A.2d 275; Williams v. Union Carbide Corp., 17 App.Div.2d 661, 230 N.Y.S.2d 476. See also Peterson v. Lamb Rubber Co., 54 Cal.2d 339, 5 Cal.Rptr. 863, 353 P.2d 575 (1960), grinding wheel. In Revlon, Inc. v. Murdock, 103 Ga.App. 842, 120 S.E.2d 912 (1961), the court refused to hold that a statute imposing strict liability to the consumer applied to the employee of a beauty shop who was injured while handling a bottle of nail polish.

Guests of the final purchaser recovered in Miller v. Louisiana Coca-Cola Bottling Co., 70 So.2d 409 (La.App.1954); Welch v. Schiebelhuth, 11 Misc.2d 312, 169 N.Y.S.2d 309 (1957). See also Thompson v. Reedman, 199 F.Supp. 120 (E.D.Pa.1961), wife riding in car. In Serrano v. Riverside Dinette Products Co., 222 N.Y.S.2d 537 (Sup.Ct.1961), the court refused to extend the New York rule to a guest.

Donees of the final purchaser recovered in Coca-Cola Bottling Works v. Lyons, 145 Miss. 876, 111 So. 305 (1927); Klein v. Duchess Sandwich Co., 14 Cal.2d 272, 93 P.2d 799 (1939); Nemela v. Coca-Cola Bottling Co., 104 S.W.2d 773 (Mo.App.1937); Blarjeske v. Thompson's Restaurant Co., 325 Ill.App. 189, 59 N.E.2d 320 (1945); Chapman v. Brown, 198 F.Supp. 78 (D. Hawaii, 1961), affirmed, 304 F.2d 149 (C.A.9), gratuitous bailee.

*Caveat:* Recovery was denied to non-consumers in Mull v. Colt Co., 31 F.R.D. 154 (S.D.N.Y.1962), where a pedestrian was hit by an automobile; Jax Beer Co. v. Schaeffer, 173 S.W.2d 285 (Tex.Civ.App.1943), employee of retailer; Loch v. Confair, 361 Pa. 158, 63 A.2d 24 (1949), shopper in self-service store; Hochgertel v. Canada Dry Corp., 409 Pa. 610, 187 A.2d 575 (1963), employee of purchaser; Rodriguez v. Shell's City, Inc., 141 So.2d 590 (Fla.App.1962), bystander injured when sanding kit disintegrated; Torpey v. Red Owl Stores, 129 F.Supp. 404 (D.Minn.1955), affirmed, 228 F.2d 117 (8 Cir.1956), friend offering assistance in sealing jar. The question was, however, left open in Courtois v. General Motors Corp., 37 N.J. 525, 182 A.2d 545 (1962). See also Chapman Chemical Co. v. Taylor, 215 Ark. 650, 222 S.W.2d 820 (1949), where the maker of a crop-dusting compound, dangerous because likely to drift, was held liable to an injured stranger, on the basis of abnormally dangerous activity.

Restatement of the Law - Torts © 2015 American Law Institute. Reproduced with permission. Other editorial enhancements © Thomson Reuters.

REST 2d TORTS § 402A